[Crim. No. 35507. Second Dist., Div. One. Jan. 20, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
DEAN RICHARD PIC'L et al., Defendants and Appellants.

832

COUNSEL

Shan K. Thever, under appointment by the Court of Appeal, M. S. Tomlinson, Tomlinson & Nydam and Roger S. Hanson for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney Gener-

al, Shunji Asari and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

JEFFERSON (Bernard), J.*—By indictment, defendants Dean Pic'l, an attorney, and Randall James Martin were charged with committing a number of felony offenses. In count I, defendants were charged with conspiracy, a felony, in violation of Penal Code section 182. It was alleged that defendants conspired to commit the crime of extortion, in violation of Penal Code section 520, the crime of bribing a witness, in violation of Penal Code section 136 1/2, the crime of attempting to induce a witness to withhold true testimony, in violation of Penal Code section 137, the crime of compounding a felony, in violation of Penal Code section 153, the crime of receiving, concealing, selling, and withholding stolen property, in violation of Penal Code section 496, and the crime of obstructing justice, in violation of Penal Code section 182, subdivision 5. Twenty-two overt acts were alleged as part of the conspiracy. The dates of the conspiracy were set forth as July 30, 1978, to August 8, 1978.

In count II, defendants were charged with committing the offense of extortion on August 7, 1978, in violation of Penal Code section 520. In count III, defendants were charged with committing the offense of bribing a witness not to attend trial, in violation of section 136 1/2 of the Penal Code. The date of this offense was alleged to be August 7, 1978. In count IV, defendants were charged with committing the offense of attempting to induce a witness to withhold true testimony, in violation of Penal Code section 137—the date of this offense alleged to be August 7, 1978. In count V, it was alleged that defendants had committed, on August 7, 1978, the offense of compounding a felony, a violation of Penal Code section 153. In count VI, defendants were charged with the offense of receiving stolen property, in violation of Penal Code section 496, the date of this offense being August 7, 1978. In count VII, defendant Martin alone was charged with committing, on August 3, 1978, the offense of receiving stolen property, a violation of Penal Code section 496.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

In counts I, II and VI, it was alleged that a principal in each offense charged was armed with a firearm within the meaning of section 12022, subdivision (a), of the Penal Code.

The motion of each defendant for a postindictment preliminary hearing was denied.[1] Their motions to set aside the indictment, made pursuant to Penal Code section 995, were granted as to counts III, IV and V—but denied as to counts I, II, VI and VII.[2] Defendants also made motions for polygraph examinations of witnesses and to strike the allegations in count I relating to objects of the conspiracy. These motions were denied. Defendants made motions to be informed of any formal grant of immunity to witnesses for the prosecution. These motions were granted. Martin's separate motion to suppress evidence was denied.

As the result of a jury trial, defendants Pic'l and Martin were found guilty as charged in counts I (conspiracy), II (extortion), and VI (receiving stolen property). Defendant Martin was found guilty as charged in count VII (receiving stolen property). The jury found that each defendant was armed with a firearm within the meaning of Penal Code section 12022, subdivision (a), as alleged in counts I, II, and VI. Defendants' motion for a new trial were denied. Defendant Martin was granted probation on certain conditions. Defendant Pic'l was sentenced to state prison for six years on count I, three years on count II, and two years on count VI. The sentences on counts II and VI were made to run concurrently with one another and consecutive to the sentence imposed on count I. The sentences on counts II and VI were stayed, with the stay to beome permanent upon service of the sentence on count I, and the findings that Pic'l was armed were stayed. Credit was granted to each

---

[1]No issue has been raised on this appeal as to denial of the motions for postindictment preliminary hearing. In *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], it was held that defendants are entitled to a postindictment preliminary hearing, but that this new rule applies only "to those indicted defendants who have not entered a plea at the time this opinion becomes final." (*Id.* at p. 594.) The *Hawkins* opinion was filed November 8, 1978, and became final 30 days thereafter. (Cal. Rules of Court, rule 24(a).) In the case before us, defendant Pic'l entered his plea on August 31, 1978; and defendant Martin entered his plea on September 22, 1978. Neither defendant, therefore, was entitled to the new rule of *Hawkins.*

[2]The People have appealed from the order setting aside counts III, IV and V of the indictment as to defendant Pic'l. This appeal is pending in this court (*People* v. *Pic'l* *(Cal.App.)) and is decided concurrently with defendants' appeal herein.

---

*Reporter's Note: Hearing granted April 23, 1981. See 31 Cal.3d 731 for Supreme Court opinion.

defendant for presentence custody. Each defendant has appealed from the judgment of conviction.

## I

### *The Factual Summary*

In July 1978, Mr. Kerhulas owned a specially built drag-racing car—generally referred to as a "dragster"—and a trailer upon which to transport it. On the evening of July 28, 1978, he participated in races at Orange County International Raceway. About 11 p.m., he put the dragster on the trailer and used his truck to tow the trailer to the apartment of friends, Kenny and Pat Green, who lived in Tustin. He parked the truck and trailer in the street, and stayed overnight in the Tustin apartment.

When he went outside about 9 a.m. the following morning, the truck and trailer with the dragster thereon were gone, including a racing car differential and other automobile accessories that were in the truck. He reported the missing property to an officer in the Orange County Sheriff Department. The approximate value of the stolen property was $120,000. Kerhulas placed an ad in the National Dragster Magazine, offering a reward of $2,000 for information leading to the return of the property. He also informed "racing people" that his property had been stolen. The property was not insured. Kerhulas wanted to get his property back as soon as possible because, among other things, he earned a significant portion of his income from drag racing.

On August 3, 1978, defendant Martin, assisted by two friends, Lara and Selevich, transported the stolen differential, one of the accessory items on the truck, to Blair's Speed Shop in Pasadena, a shop which is engaged in selling new and used parts and equipment for racing cars. Martin offered to sell the stolen differential to Mr. Lukens, owner of the shop, for $150. Lukens noticed that the differential was specially constructed for a racing dragster, and that it was worth about $1,000. By reason of the cheap price offered, Lukens concluded that the differential might be stolen. By pure coincidence, Pat Green, with whom Kerhulas was staying in Tustin when the dragster was stolen, was employed at Lukens' Blair's Speed Shop. Lukens told her that the differential offered for sale by Martin might be the stolen differential belonging to Kerhulas. Pat Green then telephoned the police and Kerhulas.

Officers came to the Lukens shop immediately and arrested Martin and his companions, Lara and Selevich. Kerhulas came to the Lukens shop and identified the differential as part of the stolen property. Later that day, Kerhulas and friends went to Martin's house. Kerhulas told Martin, who had been released on bail through the efforts of defendant Pic'l, that he would give Martin $3,000 if the dragster and his other stolen property were returned to him. Kerhulas did *not* tell Martin that criminal charges would *not* be pressed against Martin if the stolen property were returned. Martin told Kerhulas that he did not have the dragster, but would find out about it, and then get back to Kerhulas later.

Soon thereafter, Martin telephoned Kerhulas and suggested that they meet at a restaurant to discuss how much Kerhulas would pay to get his property back. They met in the restaurant; Martin directed Kerhulas to a restroom, where Martin patted down Kerhulas to determine whether Kerhulas had a bugging device upon his person. Martin told Kerhulas that the dragster had been cut in half, and that he would be in contact with Kerhulas.

Later, a man, who did not identify himself, telephoned Kerhulas at the Green apartment and said that he had talked with Martin; that they were arranging to get Kerhulas' property back, and he would soon contact Kerhulas as to the details.

On August 6, 1978, the same man telephoned Kerhulas again and said that he was part of a group who stole cars and trucks, tore them down, and relicensed them; that the Kerhuias deal had gotten into the wrong hands, but that they were going to get Kerhulas' dragster and other property back in exchange for payment of $3,000 by Kerhulas. This unidentified man also told Kerhulas thai Martin was part of the group; but that Martin was in the lower part of the group while he was higher up in the group; he explained that Martin made a big mistake; that he, the caller, wanted to do Martin a favor and get him out of a jam. This telephone caller further told Kerhulas that Kerhulas would never have gotten his property back if Martin had not "screwed up." The telephone caller then described a plan for the return to Kerhulas of his stolen property.

Later that day, the unidentified man telephoned Kerhulas again and advised him that Kerhulas was to meet Martin; that Martin would show Kerhulas half of the property and Kerhulas was to give Martin

$3,000; that thereafter Kerhulas would get his stolen property back. Kerhulas was also told that he would have to sign a release not to prosecute Martin; that the telephone caller would contact his attorney to see how the matter would be handled; again this telephone caller said he would get back to Kerhulas. The unidentified telephone caller telephoned Kerhulas again the next day, August 7, gave some further details, but indicated that Kerhulas would have to receive another telephone call later that day at which time the final deal would be made for return of the stolen property to Kerhulas.

After receiving this last call, Kerhulas contacted the deputy sheriffs, and they came to the apartment where Kerhulas was staying and attached a recorder to the telephone. About 6 p.m., Kerhulas received a telephone call from a man who identified himself as defendant Pic'l. Pic'l said that a client had asked him to handle the matter; that Pic'l had arranged to have Kerhulas' property left at the house of Pic'l's friend, Steiner; and that he, Pic'l, would prepare, for signature by Kerhulas, a document setting forth that Kerhulas would agree not to prosecute Martin.

That evening, Kerhulas received three more telephone calls, each of which was recorded, from the man who identified himself as Pic'l. In the last call, at about 11 p.m., Pic'l told Kerhulas to meet him at a restaurant in Pomona and bring $2,500 with him, and be prepared to sign an agreement not to prosecute Martin.

Kerhulas arrived at the restaurant about 11:30 p.m. A radio transmitter was attached to one of Kerhulas' legs. Kerhulas met defendant Pic'l at the restaurant and gave Pic'l an envelope which contained $2,500. Pic'l gave Kerhulas a nonprosecution agreement to sign. Pic'l stated that he had prepared the agreement himself; that the people he represented were "flaky" in getting into something they did not know how to handle by "ripping off" Kerhulas' property. Pic'l also remarked to Kerhulas: "It's not everyday a guy can take a dragster and dispose of it." As requested by Pic'l, Kerhulas signed the agreement not to prosecute, and gave it and $2,500 to Pic'l. Kerhulas testified that he gave the money to Pic'l in order to get his stolen property back as soon as he could; that he was afraid he would never get his property back if he refused to pay Pic'l and refused to sign the agreement not to prosecute. Kerhulas stated that he did not feel that he was paying the reward he advertised in the magazine and that he felt that he had to sign the nonprosecution agreement in order to get his property back.

After he signed the agreement and gave the money to Pic'l, Pic'l commented that he, Kerhulas, was a respectable citizen. The two left the restaurant together, at which time Pic'l said that he had Kerhulas' gun which had been stolen along with the dragster and other property. Pic'l gave Kerhulas a paper upon which was written the address of Steiner's house, 3526 Holt Avenue, West Covina. Pic'l told Kerhulas that he could now go to Steiner's house and pick up his property.

Kerhulas, who was in contact with surveilling officers by the radio transmitter attached to his leg, drove to the Steiner address and recovered about $70,000 worth of the stolen property. Previously, Kerhulas had received back the truck and trailer, worth about $50,000.

In the meantime, a surveilling officer, West, saw Pic'l arrive at the rendevous restaurant in a Lincoln Continental, and subsequently leave the restaurant with Kerhulas. He saw Pic'l and Kerhulas talking. Then Kerhulas got into his car, and Pic'l got into the Continental. Officer West followed both cars to the vicinity of the Steiner home at 3526 Holt Avenue. Officer West and other officers caused Pic'l's car to stop in order to arrest him. When Pic'l got out of his car, he said: "It's under the front seat." Officer West looked into the car and saw a revolver in a holster on the floorboard under the driver's seat. An officer retrieved the revolver and determined that it was loaded with five cartridges. An officer asked Pic'l where the letter was that the victim signed; Pic'l then gave the officer the agreement not to prosecute signed by Kerhulas. When booked, an envelope containing $2,500 was removed from Pic'l's trousers.

In a taped interview made soon after his arrest, Pic'l told Officer West that he, Pic'l, would not have returned Kerhulas' stolen property if Kerhulas had refused to pay the $2,500 and had refused to sign the agreement not to prosecute. At no point in that taped interview did Pic'l claim that the $2,500 paid by Kerhulas to him was a reward. Pic'l also admitted having had telephone conversations with Kerhulas with respect to arrangements for the return of the stolen property to Kerhulas.[3]

---

[3]In addition to the above evidence presented by the prosecution in its case in chief at the trial, the prosecution called as a witness the court reporter who prepared the transcript of the grand jury proceedings, and she testified to the testimony of Pic'l in the transcript, wherein Pic'l admitted that, after the arrest of Martin, Pic'l, on behalf of a client (whose identity Pic'l refused to disclose on grounds of attorney-client privilege), telephoned Kerhulas and arranged return of the property upon payment of $2,500 and signing of the nonprosecution agreement by Kerhulas; that he met Kerhulas in the res-

Kerhulas testified at trial that in all of his conversations with defendants Pic'l, Martin, and the anonymous telephone caller, neither he nor any of those persons used the word, *reward*, for return of his property. Kerhulas stated that the $2,000 reward he offered in the magazine was a reward for return of his property intact; that the terms of his offer of reward were never met because his property was not returned intact; rather, the dragster had been cut in half, and it cost him $2,862 to have it repaired; also Kerhulas testified that he never recovered $6,000 worth of the stolen property.

Steiner testified at trial that on August 7, 1978, about 7 p.m., Pic'l came to his house and asked whether he, Pic'l, could store some things there which were going to be returned to the owner thereof in a few hours. Pic'l said the things were stolen, and offered to pay Steiner for use of Steiner's property. Steiner agreed to let Pic'l use his property for this temporary storage. About 7:30 p.m., Pic'l returned to Steiner's house in a Lincoln Continental, together with two men in a truck and a trailer with a dragster on it. The two men unloaded the dragster and auto parts while Pic'l talked with them. Steiner admitted in his testimony that, after Pic'l was arrested, he, Steiner, lied to the officers in telling them that the property was not stolen. He did this in order "to save my skin and Mr. Pic'l's."

Yvonne Stephens testified that on the evening of July 30 or 31, 1978, Gary Oxenham and defendant Martin came to her house in a camper truck. Oxenham told her, in Martin's presence, that they had finally done "the big one"—that he and Martin had gone to Tustin looking for a trailer and, by accident, had found a trailer with a "heck of a bigger package with it"—a gigantic racing car worth about $100,000; that he and Martin stole the truck, trailer, and racing car; that he did not know what to do with the racing car, but he could use the truck and trailer.

taurant, presented the agreement to Kerhulas for signing, accepted the envelope containing $2,500, gave Kerhulas the paper upon which Steiner's address was written, and told Kerhulas to follow him there; that he was stopped by the officers and arrested for conspiracy and extortion; when arrested he had the loaded gun and a list of the stolen property; previously, he had observed the stolen property being unloaded at Steiner's residence; and he had no doubt that the property was stolen; he felt Kerhulas had a right to it; he, an attorney, knew that a victim of a crime had no legal right to determine whether there would be a prosecution; he did not believe that a person should have to pay money to get back stolen property; when he asked Steiner for use of Steiner's residence to deposit the stolen property, he told Steiner that it was stolen; and in all probability he would not have turned over the property to Kerhulas if Kerhulas had not signed the nonprosecution agreement and paid the $2,500.

Martin suggested cutting up the racing car or making it disappear. Oxenham said that he did not want to waste the racing car, and he would try to get some money for it. Oxenham and Martin stored the truck in her garage that evening and the next day unloaded things from it and put them also in her garage.

Ms. Stephens also testified that, on August 3, 1978, she overheard several telephone calls which Oxenham made from her house. Before he made the first call, he told her that he was calling defendant Pic'l. He made the call and asked for Pic'l. He told Pic'l that he, Oxenham, had gotten a racer; that his friend, Martin, had been busted trying to get rid of an engine or something; and Oxenham wanted Pic'l to get Martin out of jail. Later that day, Martin came to her house. Then Oxenham told Ms. Stephens that he was going to call Kerhulas, whose phone number he had obtained from credit cards and identification in the dragster. Oxenham, in the presence of Martin, then telephoned Kerhulas. During that conversation, Oxenham became angry, stating that he did not want the racing car and would "flame it," cut it up, and deliver it to Kerhulas in a small basket. After that telephone conversation, Oxenham told her that a deal was set up, that Kerhulas was all for handling it without the cops involved, but that he, Oxenham, could not do anything about the deal until he talked with Pic'l.

In another telephone call by Oxenham from her home that day, Ms. Stephens heard Oxenham tell Kerhulas that Oxenham wanted $3,500, but would settle for less than $3,000; that he did not think $3,000 was asking too much for a $180,000 racing car. Oxenham also told Kerhulas: "I have bosses just like you have got bosses," and that he was going to leave it up to his attorney to handle it. After one of the telephone conversations, Oxenham told Ms. Stephens about the deal with Kerhulas, and said that he, Oxenham, did not need the racing car, but he wanted to keep the trailer; he did not want the police involved, and if he had his way he would just meet Kerhulas and get it over with; but he did not think Pic'l would go for it.

On August 7, 1978, Ms. Stephens heard another telephone call by Oxenham wherein he asked for Pic'l, and then told Pic'l that he could not see why he should keep a racing car for which he had no use, when he could sell it back to the owner for $3,000. He asked Pic'l to handle it for him, and asked: "Will it be conspiracy?" When Oxenham said that to Pic'l, he, Oxenham, looked at Ms. Stephens, and smiled. Oxenham told Pic'l that he wanted some money out of the deal because he went

to all the trouble of stealing the dragster, and that he would not take less than $3,000. Soon thereafter, Ms. Stephens received a telephone call from Pic'l, who asked for Oxenham. Oxenham came to the phone, and she heard him ask Pic'l whether the deal was set to go. She also heard Oxenham say that he did not want "any screwups." After that conversation, Oxenham told her that Pic'l was going to contact Kerhulas to work out the arrangements, and then Pic'l would call Oxenham.

Ms. Stephens testified that Oxenham and Martin made other telephone calls from her house on the day of August 7, 1978, attempting to find a truck to move the dragster. About 8 p.m. that evening, Oxenham left her house, stating to her that he had to "step on it" if he was going to have time to pick up a truck and trailer to move the dragster. Oxenham also told Martin to stay with Ms. Stephens. Later that evening, Pic'l's secretary telephoned Ms. Stephens, attempting to find Pic'l. While Ms. Stephens and Martin remained in the house, Martin became upset and said that something was going to happen because too many people knew about "this damned thing." About 4:30 a.m. on August 8, 1978, Oxenham came to the door. He appeared depressed, and said: "Pic'l got busted. Kerhulas screwed us."

Ms. Stephens recalled another occasion in late July or early August 1978, wherein Oxenham telephoned Pic'l and said that he, Oxenham, had stolen the type of truck that Pic'l wanted, but that Pic'l would have to be patient because the truck broke down—that Pic'l would have to wait until he, Oxenham, had time to get another truck. Oxenham told Stephens that he was going to deliver the truck to Pic'l.

Ms. Stephens was not arrested; neither was she granted immunity from prosecution. On September 13 or 14, 1978, an officer searched her house with her consent. She voluntarily gave the officer her telephone records. She also voluntarily made a detailed tape-recorded statement to the officer regarding the activities of Oxenham, Martin and Pic'l. The tape-recorded statement was substantially similar to her testimony described previous herein.

## II

### Contentions on Appeal

On this appeal, defendants advance numerous contentions in an effort to secure a reversal of their judgments of conviction.

## A. *Defendant Martin's Contentions*

Defendant Martin argues that the trial court erred in the following particulars: (1) in denying his motion to strike count VII; (2) in denying his motion to suppress evidence; (3) in denying his motion to strike the allegations in count I with respect to objects of the conspiracy; (4) in receiving evidence of other crimes; (5) in receiving hearsay testimony of Oxenham as an adoptive admission; (6) in receiving evidence of alleged prior consistent statements of Ms. Stephens; (7) in receiving evidence of his (Martin's) extrajudicial statement to officers; (8) in denying his motion for a "1538.5 hearing" as to admissibility of evidence of certain telephone calls; and (9) in refusing his requested instruction on "threats and menaces" (CALJIC No. 4.40).

In addition, Martin contends that the evidence does not support the finding of his guilt beyond a reasonable doubt, and that the deputy district attorney engaged in prejudicial misconduct in argument to the jury.

## B. *Defendant Pic'l's Contentions*

In substance Pic'l argues (1) that the trial court erred in not giving an instruction, *sua sponte*, that Oxenham was an accomplice as a matter of law and that his testimony required corroboration and could not be used to corroborate testimony of other accomplices; (2) that the trial court erred in not holding that the testimony of Stephens as to statements made by Oxenham implicating Pic'l, and testimony of Kerhulas as to statements attributed to the unidentified telephone caller, "ostensibly" Oxenham, constituted inadmissible hearsay, and denied Pic'l's constitutional right to confrontation of witnesses; (3) that the trial court erred in not holding an evidentiary hearing, *sua sponte*, on newly discovered evidence in connection with Pic'l's motion for a new trial; (4) that Pic'l was denied his constitutional right to effective assistance of trial counsel in that his trial counsel failed to block inadmissible hearsay evidence; failed to request an instruction that Oxenham was an accomplice as a matter of law; failed to invoke Pic'l's right to confrontation of witnesses; and failed to seek an evidentiary hearing on the motion for a new trial; (5) that the trial court erred in not giving, *sua sponte*, an instruction, or, defense counsel was constitutionally ineffective in not requesting such instruction, with respect to Pic'l's state of mind of an innocent intent in receiving the stolen property to return it to its rightful owner in the belief that the owner and Pic'l's client had

entered into an agreement for payment of a reward to the client; (6) that it was error for the deputy district attorney to wrongfully withhold from the defense information of telephone records of Ms. Stephens; (7) that the seizure of her telephone records without a search warrant constituted an illegal search, and that any evidence secured as a result of such seizure was inadmissible as fruit of the poisonous tree; (8) that the trial court erred in requiring Pic'l to divulge the name of his client—Oxenham—in violation of the lawyer-client privilege; (9) that the trial court erred in receiving, and his trial counsel was constitutionally ineffective in not objecting to, testimony of Ms. Stephens as to a "confession/admission" of Oxenham made, assertedly, after termination of the conspiracy by the arrests of Martin and Pic'l; (10) that the prosecution knowingly permitted false evidence to be presented by witness Stephens in that the prosecution knew that one Sprague was "planning to give wilfully false testimony" and Stephens was permitted to testify as to "some of this known false testimony"; (11) that the evidence does not support Pic'l's conviction beyond a reasonable doubt; (12) that the trial court erred in permitting the prosecutor to inquire of Pic'l's character witnesses whether their opinion of Pic'l's reputation for honesty and veracity would be changed if they had known that Pic'l had filed a petition in bankruptcy; (13) that Pic'l's defense of entrapment was valid as a matter of law; (14) that Pic'l could not properly be sentenced to a term of six years on count I—conspiracy—in that such sentence is excessive because it is more than the sentence applicable to the underlying substantive charge; (15) that the prosecutor wrongfully withheld from defense counsel evidence which the prosecutor knew he would use for character impeachment; and (16) that the trial court abused its discretion in not granting a new trial.

### III

### *Martin's Appeal*

A. *Any Error in the Trial Court's Denial of the Motion to Strike Count VII?*

In count VII of the indictment defendant Martin was accused of violating section 496 of the Penal Code on August 3, 1978. It was alleged that he had received, concealed, sold, and withheld stolen property, to wit, a Ford differential, for a drag-racing car. We take note of the fact that in count VI, this same defendant was accused of violating the same Penal Code section 496, but on a different date—August 7, 1978. The

stolen property involved in count VI was also different. It was alleged to consist of a Walther 9 mm. pistol, a windscreen, a nose section, a camper-shell, a floor jack, 2 wheels and tires, a steering rod, a starter, a generator, 3 tool boxes, a parts bin, and other spare parts.

■ Martin argues that all of the acts alleged in counts VI and VII were obviously committed pursuant to a *single* criminal design, intent or plan to possess stolen property. Consequently, he should have been accused in one count only of violating Penal Code section 496 and that the Ford differential should have been a part of the property listed in count VI.

The evidence establishes that the offense charged in count VII was committed on August 3, 1978, when Martin was arrested while attempting to sell the stolen differential at Blair's Speed Shop. The offense charged in count VI was predicated on the fact that, on August 7, 1978, defendant Pic'l and Oxenham—the latter a coconspirator of defendant Martin—attempted to sell the stolen property referred to in count VI to Kerhulas, the owner from whom the property had been stolen, for the sum of $2,500 and the execution of a nonprosecution agreement. Concealing of stolen property constitutes a continuing offense. (See *Williams* v. *Superior Court* (1978) 81 Cal.App.3d 330, 343 [146 Cal.Rptr. 311].) But the offense involving the Ford differential was completed and came to an end upon Martin's arrest on August 3, 1978. The possession and concealing of the stolen property described in count VII continued until August 7, 1978, when Pic'l and Oxenham attempted to sell back to the victim Kerhulas the remaining stolen property for the sum of $2,500 and the execution of a nonprosecution agreement. Hence, the trial court did not err in denying the motion to strike count VII.

B. *The Denial of Martin's Motion to Suppress Evidence*

■ Martin contends that it was error for the trial court to deny his motion to suppress evidence. This claim of error is based on the premise that there was no probable cause for his arrest at Blair's Speed Shop. The evidence sought to be suppressed was the Ford differential and statements made by Martin following his arrest.

■ A motion to suppress evidence, made pursuant to Penal Code section 1538.5, involves a full-scale adversary hearing on the issues before the court sitting as a finder of fact. (*People* v. *Lawler* (1973) 9

Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) In a suppression-of-evidence hearing, the power to judge credibility of witnesses, to resolve conflicts in testimony, to weigh the evidence and to draw factual inferences is vested in the trial court. On appeal, all factual conflicts must be resolved in support of the trial court's disposition of the motion (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161]); and the trial court's findings, whether express or implied, must be upheld if they are supported by substantial evidence. (*Lawler, supra,* 9 Cal.3d 156, 160; *Keithley, supra,* 13 Cal.3d 406, 410.)

■ Probable cause to make a warrantless arrest exists when a state of facts known to the arresting officer would lead a man of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person arrested is guilty of a felony offense. (*Martin, supra,* 9 Cal.3d 687, 692; *People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) It is hornbook law that the test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict, but only whether the person arrested should stand trial. (*People* v. *Ingle* (1960) 53 Cal.2d 407, 413 [2 Cal.Rptr. 14, 348 P.2d 577]; see *People* v. *Maltz* (1971) 14 Cal.App.3d 381, 390 [92 Cal.Rptr. 216].)

■ At the hearing of defendant Martin's suppression-of-evidence motion, evidence was introduced establishing that on August 3, 1978, Officer Prodonovich received a radio broadcast directing him to Blair's Speed Shop in Pasadena to investigate three suspects who were attempting to sell stolen merchandise there. The broadcast included physical descriptions of the suspects and their automobile, a red Mustang. The officer arrived there about 2:15 p.m., saw Martin and two men near a red Mustang in the parking lot. Officer Prodonovich then spoke to Mr. Lukens, the owner of the shop.

Lukens told the officer that Martin and the two men had come to the shop and stated that they wanted to sell some spare parts; that Lukens accompanied them outside, looked into the trunk of the Mustang, and saw a differential that appeared to be especially built for a racing car. Lukens said that he was aware that three days previously, in Orange County, a dragster, its trailer, and spare parts had been stolen from a race driver while the driver was staying with Pat Green, an employee of Blair's Speed Shop. Lukens said that the differential in the trunk appeared to him to be the same as the described stolen differential.

Lukens informed Officer Prodonovich that Martin offered to sell the differential to Lukens for $150; that Lukens' suspicions were aroused because the differential was worth more than $1,000; that Lukens went back into the shop and spoke with Pat Green, who said that the differential was one of the stolen items; that Lukens then told her to call the police.

After speaking with Lukens, Officer Prodonovich spoke with Pat Green. She told him that theft of the dragster had been reported to police in Orange County; she gave him the telephone number of the officer in Orange County who was investigating the theft. Officer Prodonovich telephoned that number, and was told by the investigating officer that the theft had been reported and the stolen property included a dragster and a spare differential that was made specially for a racing car.

After having the above conversations with Lukens and Green in the Speed Shop, Officer Prodonovich went outside to the parking lot and placed defendant Martin under arrest. The officer then opened the trunk of the Mustang and seized the differential.

The evidence set forth above was clearly ample to support the trial court's finding of probable cause for Officer Prodonovich to arrest Martin for the felony of possessing stolen property. Hence, no error was committed by the trial court in denying defendant Martin's suppression-of-evidence motion.[4]

C. *The Denial of Martin's Motion to Strike Certain Allegations of Count I as to Objects of the Conspiracy*

Defendant Martin contends that since the trial court set aside counts III, IV, and V of the indictment, pursuant to motion under Penal Code section 995, the court erred in denying his motion to strike from count I—the conspiracy count—the allegations that Martin conspired to commit the substantive crimes involved in the dismissed counts. The

---

[4]The only argument advanced by defendant Martin with respect to the claimed invalidity of the search of the automobile trunk and seizure of the differential, and his statements, is that they are fruits of the poisonous tree of the illegal arrest under *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407]. Since we find the arrest to be legal, we must necessarily reject the fruit-of-the-poisonous-tree contention.

dismissed counts were count III (bribing a witness), count IV (attempting to induce withholding of testimony), and count V (compounding a felony).

This contention is lacking in merit. ■ A criminal conspiracy exists when two or more persons agree to commit a crime and do an act in furtherance of the agreement. (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116]; *People* v. *Van Eyk* (1961) 56 Cal.2d 471, 478 [15 Cal.Rptr. 150, 364 P.2d 326]; *People* v. *Brown* (1969) 272 Cal.App.2d 623, 627 [77 Cal.Rptr. 650].) ■ In order to prove the commission of the offense of conspiracy, it is not necessary to show that the purpose or object of the conspiracy was in fact accomplished. (*People* v. *Robinson* (1954) 43 Cal.2d 132, 140 [271 P.2d 865]; *People* v. *Witt* (1975) 53 Cal.App.3d 154, 169 [125 Cal.Rptr. 653].) Even though the evidence was insufficient to establish that Martin committed the substantive offenses involved in counts III, IV and V, such insufficiency is no bar to there being evidence sufficient to establish a conspiracy on the part of Martin, to commit those substantive offenses as charged in count I of the indictment.

### D. *Was It Error to Admit Evidence That Martin Had Committed an Offense Other Than Those Charged Against Him?*

Over defendant Martin's appropriate objection, the trial court permitted Yvonne Stephens to testify that Oxenham, in the presence of defendant Martin, told her that Oxenham and Martin had stolen Kerhulas' dragster. The clear inference from this testimony is that Martin remained silent in the face of this accusatory statement by Oxenham. No count of the indictment charged Martin with theft of the dragster. It is Martin's position, therefore, that since he was not charged with theft of the dragster, the sole purpose of the testimony that he stole the dragster was to improperly show his disposition or propensity to commit a crime of which he was not charged as evidence that he committed the various crimes for which he was on trial.

We start our discussion of this contention of Martin by recognizing certain generally accepted principles. Even assuming that evidence is properly introduced that a defendant committed a crime other than that for which he is on trial, such evidence cannot be introduced if it violates one of the exclusionary rules such as the exclusionary hearsay rule. Thus, Yvonne Stephens' testimony about Oxenham's statement to her

in the presence of Martin is a hearsay statement by Oxenham and is inadmissible (Evid. Code, § 1200, subd. (b)) unless it qualifies for admissibility under some exception to the hearsay rule. Defendant Martin's *silence* in the face of Oxenham's accusatory statement about the dragster theft becomes significant in order to create the exception to the hearsay rule for a party's adoptive admission. (Evid. Code, § 1221.)[5]

■ Assuming, as we do, that Oxenham's statement in defendant Martin's presence, complies with the requirement for the exception to the hearsay rule for a party's adoptive admission, we next consider the question of whether the evidence of the statement is barred from admissibility by Evidence Code section 1101, subdivision (b).[6] If evidence that Martin stole the dragster—which constitutes character-trait evidence—has no relevancy to prove any fact of consequence in the case before us other than his disposition or propensity to steal, as proof that he committed the offenses for which he is on trial, such evidence is barred from admissibility as character-trait evidence by virtue of Evidence Code section 1101, subdivision (b).

The People argue that this evidence of Martin's commission of the crime of theft of the dragster had relevancy apart from proof of Martin's criminal-offense character trait of a disposition or propensity to commit theft. The additional relevant facts, assert the People, include the facts of "motive," "intent" and "knowledge." Relevant issues in the case at bench certainly included the issues of whether defendant Martin committed the *acts* constituting the offenses of conspiracy, extortion, receipt, concealment and sale of items of stolen property—as charged in counts I, II, VI and VII, respectively. "[W]hen the commission of a criminal act [the crime for which defendant is on trial] is a disputed issue, evidence of *motive* may become relevant to that issue. Motive is itself a state-of-mind or state-of-emotion fact. Motive is an idea, belief, or emotion that impels or incites one to act in accordance with his state of mind or emotion. Thus, evidence, offered to prove motive, that defen-

---

[5]Evidence Code section 1221 creates an exception to the hearsay rule, known as a party's adoptive admission, by providing: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

[6]Evidence Code section 1101, subdivision (b), provides that "[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge identity, or absence of mistake or accident) *other than his disposition to commit such acts.*" (Italics added.)

dant committed an uncharged offense meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle that one tends to act in accordance with his state of mind or emotion." (Jefferson, Cal. Evidence Benchbook (1978 supp.) Special Problems Related to Relevancy, § 21.4, p. 218.) (Italics added.)

But in the case at bench, the People offer no explanation, and we are unable to supply an explanation, of how Martin's theft of the dragster—an offense not charged against him—could provide a "motive" as proof that Martin acted in conformity with such "motive" and committed the acts involved in the charged offenses for which he was on trial, to wit, conspiracy, extortion, or receipt, concealing and sale of stolen property.

However, theft by Martin of the dragster did have relevancy on other issues of "intent" and "knowledge," urged by the People. Evidence of Martin's theft of the dragster would constitute evidence having a "tendency in reason"[7] to prove that he had the requisite "intent" required for the charged offenses of conspiracy, extortion and possession, concealment and sale of stolen property. (See *People* v. *Moreno* (1976) 61 Cal.App.3d 688 [132 Cal.Rptr. 569]; *People* v. *Thompson* (1972) 25 Cal.App.3d 132 [101 Cal.Rptr. 683].) In addition, evidence that Martin stole the dragster of Kerhulas was relevant to the issue of "knowledge," an element of the crimes charged in counts VI and VII of receiving stolen property. If Martin had participated in the theft of the dragster, this fact would certainly provide him with knowledge that the *special differential* from that racing car which he offered to sell to Blair's Speed Shop was stolen property. (See *Thompson, supra,* 25 Cal.App.3d 132.)

Defendant Martin relies upon *People* v. *Gibson* (1976) 56 Cal. App.3d 119 [128 Cal.Rptr. 302], in asserting that, even if the Yvonne Stephens' evidence had some relevancy other than character-trait evidence, it should have been excluded under Evidence Code section 352 because the danger of undue prejudice outweighed its probative value. It is true that "[t]he significant teaching of *Gibson* is that, although Evid C § 352 gives the trial judge wide discretion, it is a discretion that must be exercised with discerning care in connection with the question of the admissibility of other-crimes evidence offered against a defen-

---

[7]Evidence Code section 210 defines "relevant evidence" to mean "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

dant, because of the inherently prejudicial nature of such evidence as constituting character-trait and propensity evidence." (Jefferson, Cal. Evidence Benchbook (1978 supp.) *supra*, at p. 218.) But we do not find in the case at bench that the probative value of the evidence that Martin stole the dragster was substantially outweighed by the danger of undue prejudice to mandate a holding that the trial court abused its discretion under Evidence Code section 352 in admitting such evidence.

We also take note of the fact that the trial court instructed the jury by giving a modified version of CALJIC Instruction No. 2.50. This instruction told the jury that evidence of commission by Martin of a crime other than that for which he was on trial was not to be considered to prove that he was a person of bad character or that he had a disposition to commit crimes, and that it was to be considered only for the limited purpose of determining whether it tended to show motive, intent, knowledge, or existence of conspiracy. Although it was error for the trial court to leave the words "motive" and "existence of conspiracy" in the instruction, there was little danger that the jury was misled to defendant Martin's prejudice.

E. *The Trial Court Properly Held That Oxenham's Hearsay Statement—Made in the Presence of Defendant Martin—That Oxenham and Defendant Martin Had Stolen the Dragster, Was Admissible Against Martin as a Party's Adoptive Admission*

Under part D above, we considered the admissibility of Oxenham's hearsay statement to Yvonne Stephens that he and defendant Martin had committed the theft of the dragster in light of Martin's objection that the evidence was inadmissible as character-trait propensity evidence proscribed by Evidence Code section 1101. We assumed, for purposes of our ruling on admissibility, that declarant Oxenham's accusatory statement, made to Yvonne Stephens in the presence of defendant Martin, satisfied the requirements for the exception to the hearsay rule for a party's adoptive admission. (Evid. Code, § 1221.) Defendant Martin also contends, however, that Oxenham's hearsay statement was inadmissible as hearsay evidence and that it did not satisfy the requirements for a party's adoptive-admission hearsay exception.

The thrust of Martin's argument against admissibility goes to the question of whether Martin was present when Oxenham made the state-

ment to Stephens. During Yvonne Stephens' direct examination, she unequivocally testified that Oxenham's statement, that he and Martin were the ones who stole the dragster, was made in the presence of defendant Martin.

But on cross-examination, she testified that she could not remember whether Martin was present or not. Defense counsel then moved to strike that testimony on the lack-of-foundational ground that Martin's absence when the Oxenham statement was made precluded the statement from being considered an adoptive admission of Martin; defense counsel also requested that the jury be admonished accordingly.

The trial court indicated that Martin's motion to strike would be denied but that the jury would be admonished to disregard the testimony if the jury found that Martin was not present when Oxenham made the statement; however, defense counsel indicated that he stood upon his motion to strike and only desired a jury admonition upon the testimony being stricken. The trial court reiterated the ruling that Yvonne Stephens' testimony established admissibility of Oxenham's statement as an adoptive admission. In so ruling, the trial court noted that Stephens' testimony was not strong evidence and that defense counsel could certainly comment to the jury upon the conflict in her testimony with respect to whether defendant Martin was present when Oxenham made the statement.

We observe that it is a well-settled evidentiary rule of law that evidence of another person's hearsay statement is admissible against a party as an adoptive admission if such party, with knowledge of the content of such statement, has, by words or conduct, manifested his adoption of such statement or manifested his belief in the truth of such statement. (Evid. Code, § 1221.)

■ Manifestation by a party of the adoption of, or belief in the truth of, another person's hearsay statement—especially an accusatory-type statement—frequently comes from evasive or equivocal replies. (*People* v. *Richards* (1976) 17 Cal.3d 614 [131 Cal.Rptr. 537, 552 P.2d 97]; *People* v. *Preston* (1973) 9 Cal.3d 308 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Edmondson* (1976) 62 Cal.App.3d 677 [133 Cal. Rptr. 297].) But a party's conduct of *silence* in the face of another hearsay statement of the accusatory type is equally efficacious in denoting an *adoption* of, or a *belief* in, the truth of such statement if the

circumstances are such that it would be reasonable, normal or expected for a party to speak up and deny the truth of the statement if the statement is false. (See *Edmondson, supra*, 62 Cal.App.3d 677; *People* v. *Cooper* (1947) 81 Cal.App.2d 110 [183 P.2d 67].)[8]

Since a party's conduct or words in the face of another's hearsay statement can be considered an adoption of such statement or a manifestation of belief in the truth of the statement only if the party has *knowledge* of the content of the other person's hearsay statement, proof of a party's knowledge of another's hearsay statement is crucial. Proof may be circumstantial in nature however. Thus, if *silence* is to be considered conduct manifesting a belief in the truth of another's hearsay statement, the statement must have been spoken loud enough, and the party must have been close enough for the inference to be drawn that the party heard the statement.

■ That a party had knowledge of the content of another's hearsay statement and then by words or conduct manifested an adoption of, or a belief in, its truth, are preliminary facts to be established for the hearsay statement to qualify as a party's adoptive admission and admissible under this exception to the hearsay rule. As indicated by the Assembly Committee on Judiciary's comment to Evidence Code section 403, the existence of these preliminary facts to admissibility of the hearsay statement is to be determined by the standard set forth in section 403. This standard is satisfied if the proponent of the hearsay statement produces evidence of the existence of the preliminary facts that is sufficient for a trier of fact to reasonably find therefrom the existence of such preliminary facts.

In the case before us, the record demonstrates that if defendant Martin was present when Oxenham told Yvonne Stephens that he and Martin had stolen the dragster, Martin had knowledge of the statement and his conduct of silence constituted an adoption of, or belief in, the truth of the statement. Under these circumstances, Oxenham's hearsay

---

[8]A criminal defendant's silence in the face of a police officer's accusation is to be distinguished from such silence in the face of a nonpolice officer's hearsay accusation. A defendant's silence in the face of a police officer's accusation is more reasonably due to exercise of the privilege against self-incrimination than to a belief in the truth of the accusation. Hence, such silence does not constitute an adoptive admission, and the police officer's accusatory statement and defendant's silence in response thereto are inadmissible against a criminal defendant. (See *People* v. *Savala* (1970) 10 Cal.App.3d 958 [89 Cal.Rptr. 475].)

statement was admissible against defendant Martin under the hearsay-rule exception for a party's adoptive admission.

Martin asserts, however, that since Yvonne Stephens testified on cross-examination that she could not remember whether Martin was present or not when Oxenham made his inculpatory hearsay statement, the preliminary facts for admissibility of Oxenham's statement as an adoptive admission of defendant Martin were not established. If the trial judge had to be convinced by a preponderance of the evidence of the existence of the preliminary facts of Martin's knowledge of Oxenham's statement and Martin's conduct of silence in response thereto, Martin's position would be well taken. The trial judge noted that the conflict in Stephens' direct and cross-examination testimony regarding Martin's presence when Oxenham made his inculpatory statement cast doubt on the strength of Stephens' testimony.

But under Evidence Code section 403, the evidence as to the existence of the preliminary facts for admissibility of a declarant's hearsay statement against a party as the party's adoptive admission need not convince the trial judge, by a preponderance of the evidence, that such preliminary facts exist. The trial judge needs to be convinced by the lesser burden of proof that the evidence is sufficient for a reasonable trier of fact to find that the preliminary facts exist—irrespective of the fact that the trial judge finds personally that the evidence preponderates in favor of a finding that such preliminary facts do *not* exist.[9] (See *People v. Lebell* (1979) 89 Cal.App.3d 772 [152 Cal.Rptr. 840].) In the instant case, the testimony by Stephens on direct examination that defendant Martin was present when Oxenham made his statement inculpating Martin in the theft of the dragster satisfied the prosecution's burden of proof for admissibility of the statement even though Stephens' testimony on cross-examination tended to negate the direct-examination testimony as to the presence of Martin when the Oxenham statement was made. (Evid. Code, §§ 1221, 403.)

In addition to being admissible against defendant Martin under the adoptive admission exception to the hearsay rule (Evid. Code, § 1221),

---

[9]The authorized admission exception to the hearsay rule is similar to the adoptive admission. The preliminary fact of a party's *authorization* to the declarant to speak on the subject involved is one that must be proved for admissibility of the declarant's statement against the party by the lesser burden of sufficiency of the evidence for a trier of fact to find the existence of the preliminary fact and not to convince the trial court by a preponderance of the evidence. (See Assem. Com. on Judiciary's comment to Evid. Code, § 403.)

Yvonne Stephens' testimony about Oxenham's statement to her inculpating defendant Martin in the theft of the truck, trailer and dragster, was admissible against defendant Martin under the coconspirator exception to the hearsay rule set forth in Evidence Code section 1223. This exception would be satisfied whether Martin was present or not when Oxenham made the statement to Stephens.

The requirements of the coconspirator exception to the hearsay rule are (1) that declarant's statement was made while declarant was participating in a conspiracy to commit a crime or civil wrong; (2) that declarant's statement was one that was made in furtherance of the objectives of that conspiracy; and (3) that declarant's statement was made either *prior to* or during the time that the party against whom the statement is offered was also participating in that conspiracy. The existence of the conspiracy and related circumstances as set forth in the requirements (1), (2) and (3) are preliminary facts to admissibility of a declarant's statement against a party and must be proved by the proponent of the evidence under the standard of being sufficient for a reasonable trier of fact to find the existence of such facts and not to convince the trial judge of their existence by a preponderance of the evidence.

The summary of the evidence set forth previously herein establishes, without question, that Oxenham made his statement to Yvonne Stephens while he was participating in a conspiracy with Martin and others relating to the stolen truck, trailer and dragster and related parts; that the statement was made in furtherance of the objective of the conspiracy to possess, conceal and dispose of the stolen property for some remuneration; and that the statement was made either *prior to* or *during* the time that defendant Martin was participating in that conspiracy. Oxenham's statement was thus admissible against defendant Martin, even if Martin was not present when the statement was made, as relevant evidence to prove that Martin was in possession of stolen property and concealing the same for ultimate disposition for remuneration as charged against him in the various counts of the indictment.[10]

---

[10]As with the authorized admission hearsay exception (Evid. Code, § 1222, subd. (b)), under the admission-of-coconspirator exception to the hearsay rule, the trial judge has the discretion to admit evidence of the declarant's hearsay statement prior to requiring the proponent to first introduce evidence sufficient to sustain a finding of the existence of the preliminary facts of the declarant and the party participating in the conspiracy. (Evid. Code, § 1223, subd. (c).)

## F. *The Admissibility of Prior Consistent Statements of the Witness Yvonne Stephens*

■ Over defendant Martin's objection, Officer Elliott was permitted to testify regarding out-of-court hearsay statements, made to him by Yvonne Stephens. These statements were consistent with her testimony at trial on direct examination. The prior statements which Stephens had made to Officer Elliott, and to which objection was made by defendant Martin, dealt with Stephens' assertion that Oxenham had told her that he and defendant Martin had stolen the truck, trailer and dragster; that Oxenham wanted to sell it back to Kerhulas; that Oxenham called Kerhulas and wanted him to pay $3,000 to get his property back; that defendant Pic'l called her house one morning and that Oxenham became upset because Pic'l had been arrested when he had nothing to do with the actual theft of the property of Kerhulas. All of these prior-to-trial statements made by Stephens to Officer Elliott were consistent with the trial testimony of Stephens on her direct examination.

Martin's claim of error in the receipt into evidence of these prior statements is that they violated Evidence Code section 791, which sets forth the conditions for admissibility of prior statements of a witness to *support* such witness' *credibility*. Section 791 authorizes admissibility of prior statements of a witness consistent with such witness' trial testimony to support the witness' credibility only if (1) evidence of prior inconsistent statements has been introduced to attack the witness' credibility and the prior statements consistent with the witness' trial testimony were made *before* the making of the alleged inconsistent statements; or (2) an express or implied charge has been made that the witness' trial testimony is recently fabricated or the result of some improper motive and the prior statements consistent with the witness' trial testimony were made *before* the motive for fabrication or other improper motive is alleged to have arisen.

Martin asserts that no evidence was introduced of any prior inconsistent statements made by the witness Stephens, nor was any claim made that her trial testimony was the result of any motive for fabrication or other improper motive to warrant receipt of her prior-to-trial statements to Officer Elliott. Martin concedes, however, that Stephens was asked on cross-examination whether she had been granted immunity and that she had replied in the negative, and that it had been elicited from her that no charges had ever been filed against her.

Defendant Martin's position is patently erroneous. The mere asking of questions on cross-examination relating to whether Stephens had been granted immunity from prosecution and eliciting information from her that no criminal charges had been filed against her clearly constituted an implied charge by the defense that her motive for testifying for the prosecution was to secure immunity from prosecution. Even though she testified that she had not been granted immunity, the question to her created the implication that her testimony lacked credibility and that she had a motive to give false testimony.[11] Stephens' prior-to-trial statements to Officer Elliott were made *before* the motive to fabricate arose and, hence, became admissible to support Ms. Stephens' credibility,[12] pursuant to Evidence Code section 791.

The case at bench is thus not unlike that of *People* v. *Armstrong* (1969) 275 Cal.App.2d 30 [79 Cal.Rptr. 668], in which a witness, in answer to a question posed on cross-examination, denied that he had been promised payment to testify for the prosecution. This question posed was held to constitute an implication of motive to fabricate to sanction admissibility of prior statements consistent with the witness' trial testimony. And in *People* v. *Cannady* (1972) 8 Cal.3d 379 [105 Cal.Rptr. 129, 503 P.2d 585], it was brought out that the day before a witness testified, he was told by the prosecutor that the judge might rehear his case. This was held to create an implication of a motive to falsify to justify admissibility of prior-to-trial statements of the witness consistent with his trial testimony. The cases of *Armstrong* and *Cannady* constitute compelling authority for the admissibility of the prior consistent statements of Yvonne Stephens to Officer Elliott.[13]

---

[11]In addition, at one point in the cross-examination of Yvonne Stephens, counsel for defendant Pic'l remarked: "I think her reason for testifying here is to gain favor with the prosecution so that she may not be prosecuted...."

[12]Although it was not discussed in the parties' briefs, it should be pointed out that evidence of a prior statement of a witness that is consistent with the witness' trial testimony and becomes admissible pursuant to Evidence Code section 791 to support or rehabilitate the witness' credibility, also becomes admissible to prove the truth of the matter stated in the statement as an exception to the hearsay rule pursuant to the provisions of Evidence Code section 1236.

[13]Apart from the use of Evidence Code sections 791 and 1236 to justify admissibility of Ms. Stephens' prior consistent statements, the officer's testimony of his conversations with Ms. Stephens also becomes admissible under Evidence Code section 356. Section 356 provides that where part of a conversation is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party. Here, the defendants, on cross-examination of Ms. Stephens, inquired into various subjects of the conversations with Officer Elliott. Thus, the prosecution could properly inquire in further detail as to the content of the conversations relating to the same subjects. In

### G. ▮ *Defendant Martin's Exculpatory Statement to the Police Was Erroneously Admitted Into Evidence*

After defendant Martin was arrested on August 3, 1978, he spoke with Officer Moir who asked him where he got the dragster rear end (the differential) he tried to sell to Blair's Speed Shop. Martin replied that about a month before a friend had given him this rear end for Martin's helping the friend clear out his garage. Over objection, the trial court permitted Officer Moir to testify to Martin's making this statement. It is urged by Martin that the trial court's ruling was error.

Martin asserts that the statement was not voluntarily made and, since the statement was false, that it was erroneously admitted to show his bad character.

On the issue of involuntariness, the trial court conducted an evidentiary hearing (Evid. Code, §§ 402, 405) out of the presence of the jury. Defendant Martin testified that he made the statement after he had been given his *Miranda*[14] rights and refused to waive them. Hence, the elicitation of the statement, even though exculpatory in character, after he had exercised his *Miranda* right not to talk without an attorney, made his statement inadmissible under *Miranda* and *People v. Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]. Martin also testified that he had been promised immunity and the $2,000 reward by the officers if he would talk. But Officers Moir and Mason disputed Martin's testimony and said that Martin told them he understood his rights but would talk to the officers only about the *differential* in the absence of an attorney and that he then made the statement about how he had obtained the differential.

The trial court concluded from the testimony introduced at the evidentiary-admissibility hearing that Martin's statement was made voluntarily and evidence of its making would be admissible before the jury. ▮ Where the voluntariness of a defendant's statement is dependent upon resolution of conflicts in testimony, the appellate court is

---

providing admissibility for the remainder of a conversation on the same subject, Evidence Code section 356 creates an exception to the hearsay rule without labelling it as such. (See *People v. Williams* (1975) 13 Cal.3d 559 [119 Cal.Rptr. 210, 531 P.2d 778]; Jefferson, Cal. Evidence Benchbook (1978 supp.) Principles of Relevancy, § 21.2, pp. 198-200.)

[14]*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

bound by the resolution made by the trial court. (*People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672].)

In the case at bench, however, the determination of voluntariness does not end the inquiry as to admissibility. Defendant Martin's statement was neither an admission nor confession since it was an exculpatory statement—not an inculpatory or incriminating statement. The statement was thus *not* offered in evidence by the prosecution as a hearsay statement—offered to prove the truth of the facts asserted in the statement—made admissible by the exception to the hearsay rule for a party's personal admissions. (Evid. Code, § 1220.)

Martin's exculpatory statement to the police officers was offered into evidence necessarily by the prosecution as *nonhearsay* evidence—not offered for its truth. *Nonhearsay* evidence, as well as hearsay evidence, must meet the test of *relevancy* to be admissible. Did the statement have a tendency in reason to prove some disputed fact of consequence in the action as required by Evidence Code section 210, which defines relevant evidence? Since Martin did not testify, his extrajudicial exculpatory statement was not admissible to impeach his credibility as a witness.

Defendant Martin's contention is that his exculpatory statement was admitted on a theory that it tended to show his bad character and untruthfulness since the prosecution's evidence revealed that his statement, though exculpatory in nature, was actually false. Martin's point on inadmissibility is well taken. The situation before us is not unlike that presented in *People* v. *Morgan* (1978) 87 Cal.App.3d 59 [150 Cal.Rptr. 712]. In *Morgan* it was argued that defendant's exculpatory statement conflicted with the testimony of a prosecution witness and thus led to an inference that it established that the *Morgan* defendant had a consciousness of guilt. But the *Morgan* court rejected this rationale that such a conflict could be said to lead reasonably to an inference that defendant's statement was proved false and established defendant's state of mind of consciousness of guilt. The *Morgan* court held that any such inference of a consciousness of guilt on defendant's part would amount to rank speculation since the trier of fact had not heard from the defendant as a witness and, hence, would constitute a *nonreasonable* inference. A *nonreasonable* inference sought to be drawn from evidence makes such evidence *irrelevant* and inadmissible since evidence, to be *relevant*, is limited by Evidence Code section 210 to evidence having a tendency *in reason* to prove a disputed fact that is of

consequence to the determination of the action. We conclude, therefore, that it was error for the trial judge to admit evidence of defendant Martin's exculpatory statement.[15] We shall consider subsequently the question of whether this erroneous ruling constituted prejudicial error.

H. ■ *No Error in the Denial of Defendant Martin's Motion to Suppress Evidence of Telephone Records*

At trial, the prosecution called as a witness Walter Schmidt, custodian of records of General Telephone Company. Schmidt appeared pursuant to a subpoena duces tecum to obtain records of telephone numbers assigned to defendant Pic'l. Prior to Schmidt's appearance, Yvonne Stephens had testified that Oxenham had made a telephone call to Pic'l in her presence but did not know whether the call from her (213) area code was to another area code (714) number. Telephone records of Stephens for the period July-August 1978 did not reveal any calls to area code (714).

The testimony of Schmidt, based on the telephone company's records, simply set forth a listing of defendant Pic'l's several telephone numbers, the dates of commencement and termination of service at the various numbers. Schmidt also testified that if a collect call to an area code (714) number was made from Stephens' area code (213) number, that call would not appear on Stephens' telephone records.

Martin's claim of error is that he was denied the right to see the subpoena issued to General Telephone Company and that the telephone records of Pic'l were privileged from production and disclosure. Hence, asserts Martin, the trial court erred in denying his motion for a Penal Code section 1538.5 hearing to suppress the evidence of Pic'l's telephone records.

---

[15]The instant case and the *Morgan* case are to be distinguished from a situation in which a defendant makes an extrajudicial *exculpatory* statement and then *testifies* as a witness and gives testimony that conflicts with his extrajudicial exculpatory statement. In *People v. Underwood* (1964) 61 Cal.2d 113 [37 Cal.Rptr. 313, 389 P.2d 937], it was held that a defendant's exculpatory statement that was proved false by *defendant's own trial testimony* could logically lead to an inference that the defendant had a consciousness of guilt and thence to a second inference that he had acted in conformity with his state of mind and had committed the crime charged. (See *People v. Thomas* (1979) 96 Cal.App.3d 507 [158 Cal.Rptr. 120]—a case similar to *Underwood* and reaching the same result but distinguishing *Morgan*.)

We conclude that no observable prejudice accrued to defendant Martin from the failure of the prosecution to show Martin's counsel the subpoena. The only records which Schmidt brought to court pursuant to the subpoena were records relating to his testimony as to Pic'l's various telephone numbers; and Martin's counsel cross-examined Schmidt as to that testimony, and, if he so desired, could have examined the records which Schmidt brought to court. The issue of whether the telephone records were privileged will be discussed subsequently in connection with the appeal of defendant Pic'l.

### I. Sufficiency of the Evidence to Support Defendant Martin's Convictions

Defendant Martin contends that the evidence was insufficient to support the findings of guilt made by the jury. He focuses his argument esspecially on count I—the conspiracy count. He claims that the only evidence connecting him with the conspiracy was the testimony of Yvonne Stephens; that her credibility was weak; and that she was an accomplice whose testimony was not adequately corroborated.

In reviewing a criminal conviction for sufficiency of the evidence to sustain such conviction, the function of an appellate court is to determine whether a rational trier of fact, in light of *all* the evidence presented, could have found that the prosecution sustained its burden of providng defendant guilty beyond a reasonable doubt by finding all of the essential elements of the crime to exist beyond a reasonable doubt. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 496 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *Baldwin* (1979) 97 Cal.App.3d 396 [159 Cal.Rptr. 15]; *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].) If a rational trier of fact could have so found, the conviction must be sustained.

The credibility of Yvone Stephens as a witness and the weight to be given her testimony were, of course, matters to be determined by the jury. (*People* v. *Lyons* (1956) 47 Cal.2d 311, 320 [303 P.2d 329]; *People* v. *Ontiveros* (1975) 46 Cal.App.3d 110, 117 [120 Cal.Rptr. 28].)

Is defendant Martin's contention sound that Stephens was an accomplice? An accomplice is defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause

in which the testimony of the accomplice is given. (Pen. Code, § 1111; see *People v. Gordon* (1973) 10 Cal.3d 460, 466 [110 Cal.Rptr. 906, 516 P.2d 298].) While there was evidence that Stephens may have been an accomplice with respect to receiving the stolen property charged in count VI since she permitted Oxenham and Martin to store some of the stolen property in her garage, knowing that it was stolen, the record is barren of any evidence which would tend to establish that she was an accomplice to the conspiracy charged in count I.

But even if we were to assume that Stephens was an accomplice to the conspiracy in indirectly aiding perpetration thereof (see *People v. Long* (1970) 7 Cal.App.3d 586, 591 [86 Cal.Rptr. 590]), with knowledge of the perpetrators' criminal intent (see *People v. Herrera* (1970) 6 Cal.App.3d 846, 852 [86 Cal.Rptr. 165])—an assumption the evidence would not permit us to make—her testimony implicating defendant Martin in the conspiracy was corroborated by the following items of independent evidence: that Martin possessed and tried to sell the stolen differential; that Martin met Kerhulas in the restaurant and told him that "they" had his property and Martin would be in contact with Kerhulas as to getting the property back; and that, thereafter, someone telephoned Kerhulas, telling him that he (the caller) had talked with Martin and they were making arrangements to get the property back, and that Martin was a member of the group that stole Kerhulas' dragster and other property.

After reviewing *all* of the evidence—both prosecution and defense evidence—in the light most favorable to the People, we conclude that a rational trier of fact certainly could have found defendant Martin guilty of the conspiracy offense charged in count I beyond a reasonable doubt.

J. *Refusal to Give Requested Instruction on "Threats and Menaces" (CALJIC 4.40)*

 Defendant Martin asserts that it was error for the trial court to fail to give CALJIC instruction No. 4.40.[16] This assertion of error is based upon the premise that CALJIC No. 4.40 was made necessary as

---

[16]CALJIC No. 4.40 (1979 revision) provides as follows: "A person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶] 1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and [¶] 2. If such person then believed that his life would be so endangered. [¶] This rule does not apply to threats, menaces, and fear of future danger to his life."

a result of the testimony of the victim Kerhulas that after Martin was released from jail, Kerhulas and his friends went over to Martin's home and that Kerhulas threatened physical injury to Martin if Martin did not make arrangements for the return to Kerhulas of the latter's stolen property.

Martin contends that this testimony by Kerhulas raised an issue of whether the arrangements which were made for the return of the property to Kerhulas (a basis for the conspiracy) were prompted by Kerhulas' threats. In light of this issue, it is the position of Martin that CALJIC No. 4.40 should have been given. Defendant relies upon cases such as *People* v. *Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153], and *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913], which hold that a defendant is entitled to instructions regarding defenses made relevant by virtue of the evidence.

This theory of defendant Martin must necessarily fail as the testimony of Kerhulas is insufficient to trigger the relevancy of CALJIC No. 4.40. There was no testimony by defendant Martin or any other witness that Martin's participation in arrangements for the return of the stolen property to Kerhulas was the result of fear of immediate danger to Martin's person emanating from the threats of Kerhulas. There is thus an absence of any evidence that Kerhulas' threats had any effect in causing Martin to undertake any actions whatever out of a fear that his life was in immediate danger.

Moreover, the defense of duress stated in CALJIC instruction No. 4.40 is expressly made inapplicable to threats of *future* danger to a defendnt's life. (*People* v. *Quinlan* (1970) 8 Cal.App.3d 1063, 1067-1068 [88 Cal.Rptr. 125]; *People* v. *Lewis* (1963) 222 Cal.App.2d 136, 141 [35 Cal.Rptr. 1]; *People* v. *Otis* (1959) 174 Cal.App.2d 119, 125-126 [344 P.2d 342].) At best, the threats of Kerhulas could only be interpreted as a threat of future danger. No claim of error can be predicated on the refusal of a trial court to give an instruction which has no foundation in the evidence or in any theory upon which the case was tried. (*People* v. *Carter* (1957) 48 Cal.2d 737, 758 [312 P.2d 665]; *People* v. *Brunt* (1972) 24 Cal.App.3d 945, 955-956 [101 Cal.Rptr. 457].)

### K. *The Issue of Whether There Was Prosecutorial Misconduct*

Finally, defendant Martin asserts taht the deputy district attorney committed reversible error in his closing arguments. In closing

argument to the jury, the deputy district attorney read a modified excerpt from a dissenting and concurring opinion by Mr. Justice White in *United States v. Wade* (1967) 388 U.S. 218, 256-258 [18 L.Ed.2d 1149, 1174, 1175, 87 S.Ct. 1926]. The modified excerpt is as follows: "To this extent, our so called adversary system is not adversary at all nor should it be. Defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must· be and is interested in preventing the conviction of the innocent, but absent a voluntary plea of guilty, we also insist that he defend his client whether he is innocent or guilty. The state has the obligation to present the evidence. Defense need present nothing even if he knows what the truth is. He need not furnish any witnesses to the police or reveal any confidences of his client or furnish any other information to help the prosecution's case. [¶] If he can confuse the witness or make him appear at a disadvantage, unsure or indecisive, that will be his normal course. [¶] Our interest in· not convicting the innocent, permits counsel to put the state's case in the worse possible light regardless of what he thinks or knows to be the truth. Undoubtedly, there are some limits which defense counsel must observe, but more often than not, defense counsel will cross-examine a prosecution witness and impeach him if he can, even if he thinks the witness is telling the truth just as he will attempt to destroy a witness he thinks is lying. [¶] In this respect, it is part of our system."

In *People v. Beyea* (1974) 38 Cal.App.3d 176, 196-197 [113 Cal.Rptr. 254], the court approved of the reading of this excerpt from *Wade* to the jury by the prosecutor in final argument in rebuttal to remarks derogatory of the prosecutor, made by defense counsel in his prior argument to the jury.

In the case before us, the reading of the excerpt from *Wade* was preceded by certain derogatory remarks which defense counsel made about the prosecutor in argument to the jury. Thus, counsel for defendant Pic'l, Martin's codefendant, argued to the jury that the prosecutor by design or otherwise had characterized inaccurately the evidence introduced against that defendant; that evidence classified by the prosecutor as red herrings was evidence most favorable to the defense; that the prosecutor had told a witness to withhold telephone records from the defense; that the prosecutor dragged witness Yvonne Stephens back into court and had her commit perjury; that without her testimony there was no "prayer in hell" that defendant Pic'l could be tied to any conspiracy and that the prosecutor was aware of this; that the fact that defendant

Pic'l was a practicing attorney held in highest esteem by everybody was omitted by the prosecutor in his opening statement to the jurors; that the best that the prosecutor could do with respect to the testimony of a defense witness was to let the jury infer that this defendant bought the witness' testimony; that the only purpose of a question by the prosecutor in cross-examining defendant Pic'l was to embarrass him; and that it was ironical that the prosecutor would in good faith play a tape recording at the trial without knowing that the batteries were going dead.

It is of some significance that, before reading the *Wade*-opinion excerpt as a part of his closing argument, the deputy district attorney—out of presence of jurors—advised the court that he intended to read it because he felt that defense counsel, in argument to the jury, had challenged his honesty and integrity. The trial court then ruled that the prosecutor was entitled to read the excerpt.

It is unfortunate that either defense counsel or prosecutor should stoop to making personal attacks upon the honesty or integrity of the opponent. Such personal attacks have no place in our adversary system. When it does occur, it should be nipped in the bud immediately by the trial court. It is certainly not the better remedy to permit the maligned counsel to answer by in turn maligning his adversary. This is the net result of the *Beyea* solution—permitting the prosecutor to read from Mr. Justice White's concurring opinion in *Wade*.

Mr. Justice *White's* assessment of the role of the defense counsel in a criminal case vis-à-vis the role of the prosecutor, is not one that is shared by all judges or courts. It paints with too broad a brush. In seeking to determine the true facts in our adversary system, it is inappropriate and inaccurate to describe prosecutors in general as being more apt to be the real searchers for the truth than are defense counsel in general. Although a personal attack upon one's adversary by defense counsel should not be permitted to remain unanswered, we do not believe that a statement of Mr. Justice White's views set forth in *Wade* should be considered the correct response. Two wrongs do not make a right. Thus, defense counsel's misconduct does not justify a tit-for-tat answering misconduct by the prosecutor. We consider this to be the teaching of *People* v. *Perry* (1972) 7 Cal.3d 756 [103 Cal.Rptr. 161, 499 P.2d 129].

Under the circumstances presented in the case at bench, however, we think there was little chance that the jury would consider the prosecu-

tor's reading of the *Wade* excerpt as directed at defense counsel for Martin, rather than at defense counsel for defendant Pic'l. In addition, the jury was adequately instructed that statements by counsel did not constitute evidence and that the issues had to be decided on the basis of the evidence. Any error, therefore, comes within the category of harmless error.

## IV

### *Defendant Pic'l's Appeal*

A. *The Issue of Whether the Trial Court Was Required to Give an Instruction, Sua Sponte, That Persons Who Did Not Testify Were Accomplices*

One contention advanced by defendant Pic'l is that the trial court should have given, *sua sponte*, an instruction that Oxenham and the unidentified telephone caller—ostensibly Oxenham also—who telephoned Kerhulas, were accomplices as a matter of law and that evidence of their statements, received in evidence, required corroboration by independent evidence tending to connect defendant Pic'l with commission of the crimes charged against him before he could be found guilty on the basis of evidence of such statements. The corroboration-of-accomplice-testimony requirement is derived from Penal Code section 1111.[17]

 Under the applicable rule that the court must, on its own motion, give instructions in criminal cases on the general principles of law pertinent to the case on trial, the court is required to instruct on the need for corroboration of an accomplice's testimony whenever the testimony given upon the trial is sufficient to warrant the conclusion on the part of the jury that a witness implicating a defendant was an accomplice. (*People v. Bevins* (1960) 54 Cal.2d 71 [4 Cal.Rptr. 504, 351 P.2d 776]; *People v. Gordon* (1973) 10 Cal.3d 460 [110 Cal.Rptr. 906, 516 P.2d 298].)

 Initially, we must determine whether or not Penal Code section 1111 is applicable here. The corroboration requirements of section

[17]Penal Code section 1111 provides in pertinent part as follows: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

1111 come into play only when "the *testimony* of an *accomplice*" (italics added) is used as the basis for a defendant's conviction. Thus, the applicability of Penal Code section 1111 to the case before us turns on whether or not Oxenham and the ostensibly unidentified man were accomplices and, if so, whether or not their out-of-court hearsay statements incriminating defendant Pic'l constituted "*testimony*" within the meaning of Penal Code section 1111. Neither Oxenham nor the ostensibly unidentified telephone caller took the witness stand and testified as witnesses.

█ "In order to establish that an individual is an accomplice, a defendant bears the burden of both producing evidence raising that issue and of proving the accomplice status by a preponderance of the evidence." (*People* v. *Belton* (1979) 23 Cal.3d 516, 523; fn. omitted [153 Cal.Rptr. 195, 591 P.2d 485].) █ Here, however, the prosecution's own evidence established that Oxenham and the so-called unidentified telephone caller were accomplices, thus relieving defendants of this initial burden of proof.[18] But in order for the corroboration requirements of Penal Code section 1111 to be considered applicable, we would have to hold that the out-of-court statements of Oxenham and the so-called unidentified telephone caller, testified to by Yvonne Stephens and Douglas Kerhulas, respectively, constituted "testimony" within the meaning of section 1111.

█ "'Testimony' is generally described in both statutory and decisional law as oral statements made by a person under oath in a court proceeding." (*Belton, supra,* 23 Cal.3d 516, 524.) And as pointed out by *Stern* v. *Superior Court* (1947) 78 Cal.App.2d 9, 13 [177 P.2d 308], "[a]ll evidence is not testimony. Testimony is limited to that sort of evidence which is given by witnesses speaking under oath or affirmation [citation]. . . ."

The only departure from this generally accepted concept that "testimony" is limited to in-court statements given under oath by a *witness* in a court proceeding is found in the *Belton* case. In *Belton,* the court extended the concept of "testimony" within the meaning of Penal Code section 1111 to cover the prior inconsistent statements of a witness, admissible under the prior-inconsistent-statement exception to the hearsay

---

[18]Under Penal Code section 1111, an accomplice is "defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

rule. (Evid. Code, § 1235.) In *Belton*, the accomplice-witness' in-court testimony was exculpatory. It was the out-of-court inconsistent hearsay statements of the witness that constituted the incriminating evidence against the defendant which needed corroboration under Penal Code section 1111. Since Oxenham and the so-designated unidentified telephone caller in the case before us did not testify at all as witnesses, the *Belton* case cannot constitute authority for holding that their out-of-court hearsay statements constituted "testimony" within the meaning of Penal Code section 1111.[19] We conclude, therefore, that the trial court committed no error in failing to give, *sua sponte*, the instruction regarding the necessity for a nonwitness accomplice's out-of-court hearsay statements to be corroborated by independent evidence as suggested by defendant Pic'l.

B. *No Denial of Defendant Pic'l's Constitutional Right of Witness Confrontation by the Admission Into Evidence of Hearsay Statements Qualifying Under the Coconspirator Hearsay Exception and Made by Declarants Who Were Not Called to Testify as Witnesses*

Defendant Pic'l asserts that he was deprived of his constitutional right under the Sixth and Fourteenth Amendments to the United States Constitution to confront and cross-examine declarants Oxenham and an unidentified telephone caller whom Pic'l indicates the jury could infer was also Oxenham. Hearsay statements of Oxenham were admitted through the testimony of Yvonne Stephens. Hearsay statements of the unidentified telephone caller—ostensibly Oxenham—were admitted through the testimony of Kerhulas, the victim.

The hearsay statements of Oxenham and the telephone caller, heard by Stephens and Kerhulas, respectively, set forth such relevant facts as the theft of the truck, trailer, and dragster of Kerhulas by Oxenham and defendant Martin and the commission thereafter of the various crimes of which defendants Martin and Pic'l were convicted, including

---

[19]The *Belton* court reached its result by construing the meaning of "testimony" as used in Penal Code section 1111. "To conclude that such evidence does not fall within the ambit of section 1111 merely because an out-of-court statement is not, strictly speaking, synonymous with 'testimony' would be to thwart the purposes of that section. Accordingly, applying the basic principle that legislative intent prevails over literal construction, this court concludes that Fouse's [the witness'] prior inconsistent statement constituted 'testimony,' as the term is used in section 1111." (*Belton, supra*, 23 Cal.3d 516, 526.)

the conspiracy charged in count I, with Martin and Pic'l being the indicted coconspirators and Oxenham being an unindicted coconspirator.

This is not a case of evidence being admitted of hearsay statements of declarant Oxenham as an unidentified telephone caller—hearsay statements which did *not* qualify for admissibility under a recognized exception to the hearsay rule. These hearsay statements clearly satisfied the exception to the hearsay rule for admissions of a coconspirator set forth in Evidence Code section 1223.[20] Under section 1223, the hearsay statements here involved were made admissible against defendant Pic'l because (1) they were made by declarant Oxenham while he was participating in a conspiracy to commit the crimes of which defendant Pic'l was convicted; (2) they were made in furtherance of the objectives of the conspiracy; and (3) they were made prior to or during the time that defendant Pic'l, as the party against whom the statements were offered, was participating in that conspiracy; and (4) other evidence was admitted—apart from the hearsay statements—sufficient to sustain a finding of the existence of the facts specified in (1), (2), and (3) above.

Although Kerhulas did not know Oxenham and could not, therefore, authenticate the voice of the unidentified telephone caller as being that of Oxenham, the other evidence presented was sufficient to authenticate the telephone calls to Kerhulas as calls coming from Oxenham. Had there not been this authenticating evidence, these telephone calls to Kerhulas from an unidentified person who remained unidentified would have constituted *irrelevant* hearsay. (See Evid. Code, § 403, subd. (a); *People* v. *Witt* (1975) 53 Cal.App.3d 154 [125 Cal.Rptr. 653]; *People* v. *Collins* (1975) 44 Cal.App.3d 617 [118 Cal.Rptr. 864]; Jefferson, Cal. Evidence Benchbook (1978 supp.) § 24.4, pp. 263-266.)

 Defendant Pic'l concedes that the constitutional right of witness confrontation does not bar admissibility to evidence of a declarant's hearsay statements that satisfy a recognized hearsay excep-

---

[20]Evidence Code section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

tion. But he urges a rule to the effect that if the hearsay involved has critical probative value against a criminal defendant, it should be deemed a violation of the constitutional witness-confrontation right unless the declarant is available as a witness to be cross-examined by the defendant. Defendant Pic'l finds comfort and solace for this view from certain dicta contained in *People* v. *Coble* (1976) 65 Cal.App.3d 187 [135 Cal.Rptr. 199]. The *Coble* case involved the hearsay exception for a declaration against penal interest and, relying upon *People* v. *Leach* (1975) 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296], held that a declarant's against-interest hearsay statement does not make admissible against a defendant *other* statements of the declarant—statements not against declarant's penal interest—but which inculpate and incriminate defendant in the crime charged against that defendant. As the *Leach* court points out, there is no hearsay exception to make admissible against a defendant such *other* statements of the defendant.

The *Coble* case does make a dictum pronouncement that to admit against a criminal defendant the nondisserving portions of a declarant's hearsay statements which incriminate the defendant with respect to the crime for which that defendant is on trial would violate that defendant's constitutional witness-confrontation rights under the Sixth and Fourteenth Amendments. But since *Leach* declared that such nondisserving, incriminating-against-defendant statements were not admissible under the declaration-against-interest exception to the hearsay rule, the *Coble* dictum can have no application to the case at bench since we are not here dealing with *inadmissible* hearsay being received against defendant Pic'l.[21]

The United States Supreme Court has made it clear that a criminal defendant's right of witness-confrontation and cross-examination guaranteed by the Sixth and Fourteenth Amendments does not preclude admissibility against a defendant of hearsay evidence which complies with an exception to the hearsay rule—even if the declarant is not available at trial for confrontation and cross-examination by the defendant. Thus, in *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065], the United States Supreme Court specifically mentioned that it had recognized the admissibility against a criminal defendant of dying declarations of a declarant, deceased at trial, as being beyond the scope of the constitutional rule requiring confrontation

---

[21]For a discussion of the *Leach* and *Coble* cases, see Jefferson, California Evidence Benchbook (1978 supp.) section 6.2, pages 110-114.

of witnesses. The exception to the hearsay rule for the admissibility against a defendant of evidence of hearsay statements by coconspirators has likewise been recognized by the nation's and the state's high courts as no violation of a defendant's right to confront and cross-examine witnesses. (*Dutton* v. *Evans* (1970) 400 U.S. 74 [27 L.Ed.2d 213, 91 S.Ct. 210]; *People* v. *Brawley* (1969) 1 Cal.3d 277 [82 Cal.Rptr. 161, 461 P.2d 361].) Furthermore, in the case before us, we do not interpret the hearsay statements of Oxenham as constituting evidence of the *critical* importance which Pic'l ascribes to such evidence. Certainly the hearsay statements of Oxenham had substantial probative value to the prosecution's case against defendant Pic'l. But even in the absence of such evidence, the prosecution's evidence against defendant Pic'l had substantial probative value.

C. ▮ *The Trial Court Committed No Error in Not Conducting, Sua Sponte, an Evidentiary Hearing on Defendant Pic'l's Motion for a New Trial Based on the Ground of Newly Discovered Evidence*

Defendant Pic'l asserts that the trial court erred in not holding, *sua sponte*, an evidentiary hearing on his motion for a new trial, insofar as it was predicated on the ground of newly discovered evidence.

The asserted newly discovered evidence was set forth in a declaration by Oxenham, made under penalty of perjury, which, according to Pic'l,[22] was presented during the hearing of his motion for a new trial and which tended to refute the testimony of Yvonne Stephens regarding the telephone calls made by Oxenham to Pic'l on August 3, 1978.

Penal Code section 1181 provides, in part pertinent for our purposes, that when a verdict has been rendered against the defendant, the court may, upon his application, grant a new trial, in the following cases: "8 When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant *must* produce at the hearing, in support thereof, the *affidavits of* the witnesses by whom such evidence is expected to be given,..." (Italics added.)

---

[22]The asserted declaration of Oxenham has not been included in the record on appeal.

It is Pic'l's position that when he presented the declaration of Oxenham, Penal Code section 1181, subdivision 8, mandated the holding of an *evidentiary* hearing by the trial court.

Pic'l also asserts that the basis upon which the court should have held an evidentiary hearing on the issue of newly discovered evidence, together with supporting proof, is set forth in a petition for writ of habeas corpus which Pic'l filed concurrently with his opening brief herein.[23]

Defendant Pic'l has made no showing that he was entitled to an evidentiary hearing on his motion for new trial because of the Oxenham affidavit filed with the trial court. In *Linhart* v. *Nelson* (1976) 18 Cal.3d 641 [134 Cal.Rptr. 813, 557 P.2d 104], our high court was called upon to interpret Code of Civil Procedure sections 657 and 658. Section 658 provides that when an application for a new trial is made upon the ground of newly discovered evidence (and several other grounds), it "must be made upon affidavit." The *Linhart* court held that, in view of the mandatory nature of the language of section 658, a motion for a new trial on any such ground had to be presented *solely* by affidavit and determined solely on the affidavits presented; that the testimony of witnesses was impermissible on any hearing to determine the motion for a new trial.

The language of Penal Code section 1181, subdivision 8, is also mandatory in nature and very similar to the language of Code of Civil Procedure section 658 in providing that, when a motion for a new trial is made upon the ground of newly discovered evidence, "the defendant *must* produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, ..." (Italics added.) We consider *Linhart* to be dispositive of the contention made by defendant Pic'l. Accordingly, we hold that a motion for a new trial in a criminal case, made upon the ground of newly discovered evidence, must be decided solely upon affidavits because of the mandatory lan-

---

[23]Defendant Pic'l's opening brief (filed Mar. 17, 1980) states that the habeas corpus petition was filed concurrently with the brief. Respondent's brief states that there was no record of such filing in this court. Pursuant to Evidence Code sections 452, subdivision (d), and 459, we take judicial notice of the records of this reviewing court. Accordingly, we find that it was on July 18, 1980, after the herein appeal was calendared for oral argument, that Pic'l filed in this reviewing court a petition for writ of habeas corpus. We denied Pic'l's motion to consolidate the petition with this appeal. Pic'l's petition for a writ of habeas corpus will be considered separately from our decision on this appeal.

guage of Penal Code section 1181, subdivision 8, and that the trial court is prohibited from conducting an evidentiary hearing at which witnesses would be permitted to testify.

██ We thus find no error in the trial court's ruling denying Pic'l's motion for a new trial based upon newly discovered evidence. Defendant Pic'l made no showing that the purported newly discovered evidence set forth in Oxenham's declaration could not, with reasonable diligence, have been discovered and produced by Pic'l at the trial. In addition, in denying defendant Pic'l's motion for a new trial, the trial court remarked that the contents of the Oxenham declaration were not of sufficient weight to warrant the granting of a new trial on the ground of newly discovered evidence. It is a well settled principle that the granting or denial of a motion for a new trial on the ground of newly discovered evidence rests in the sound discretion of the trial court; and an appellate court is not justified in interfering with the trial court's ruling except upon a clear showing of an abuse of discretion by the trial court. (*People* v. *Greenwood* (1957) 47 Cal.2d 819 [306 P.2d 427].) We find no showing of any abuse of discretion in the instant case.

D. ██ *There Was No Suppression of Telephone Records of Witness Yvonne Stephens to Constitute Prosecutorial Misconduct.*

Defendant Pic'l advances the argument that the prosecutor suppressed evidence of Yvonne Stephens' telephone records for July and August 1978, which would have refuted her testimony that she overheard Oxenham telephone defendant Pic'l from her (213) area code number to Pic'l's (714) area code number—a long distance or toll call. Pic'l's brief does not tell us where in the record below this testimony of Stephens is to be found. Our independent review of the record indicates that Pic'l does not correctly characterize Stephens' testimony. Stephens did not testify that she observed Oxenham telephone Pic'l from her area code (213) number to a different area code number. On the contrary, she testified that she did not know what area code number Oxenham dialed in making telephone calls to Pic'l from her phone.

Defendant Pic'l makes no showing that the prosecutor suppressed any telephone records of Stephens. The record of the trial reveals that when the subject of Stephens' telephone records arose during the testimony of Stephens, the prosecutor was not in possession of her telephone records

for the months of July and August 1978—the relevant period in question. Subsequently, the prosecutor obtained Stephens' telephone records for those two months, gave copies of those records to Pic'l's trial counsel and then recalled Stephens to the witness stand. Upon her recall to the stand, she was cross-examined concerning those records by Pic'l's trial counsel who introduced these records into evidence as a defense exhibit. A General Telephone Company employee, Walter Schmidt, testified that if collect toll calls were made from Stephens' area code (213) number to an area code (714) number, such collect calls would not be reflected on the telephone company records of calls from Stephens' area code (213) number but on the telephone records for the area code (714) number to which such calls were made. It is clear that Pic'l's contention regarding prosecutorial misconduct in the suppression of Stephens' telephone records is manifestly lacking in merit.

E. ▆ *There Was No Suppression of Oxenham as a Witness by the Prosecutor to Constitute Prosecutorial Misconduct*

Another claim of evidence suppression by defendant Pic'l is that the prosecutor suppressed Oxenham as a witness when the former learned that the latter would not corroborate Yvonne Stephens in her testimony about the phone calls from her residence made by Oxenham. This claim of defendant is likewise lacking in merit.

Pic'l asserts that the prosecutor promised the trial court that he would produce Oxenham—the unindicted coconspirator—knowing at the time he made the promise that Stephens' phone bills would show her testimony to be false about Oxenham's calls to Pic'l from her (213) area code number to an area code (714) number. We have previously indicated that Pic'l points to no place in the record to substantiate his allegations regarding Stephens' testimony that she observed Oxenham make a telephone call to an area code (714) number from her area code (213) number. It is true that, during trial, the prosecutor informed the court that he would call Oxenham to testify if the court so desired. However, the court did not direct the prosecutor to call Oxenham; nor did counsel for Pic'l request that Oxenham be called; nor did counsel for Pic'l call Oxenham as a witness.

Defendant Pic'l seeks to justify his failure to call Oxenham as a witness by reliance on the lawyer-client privilege. (Evid. Code, § 954.) It is Pic'l's position that since Oxenham was his client, it would have been a violation of the lawyer-client privilege for the lawyer to call his client as

a witness. This view lacks substance for several reasons. *First.* Pic'l indicates that Oxenham would have testified that he made no telephone calls from Stephens' home to Pic'l, which would have rebutted Stephens' testimony that he did make such calls. Such rebuttal testimony would have fallen outside the lawyer-client privilege as it would not have revealed any "confidential communication between client and lawyer" (Evid. Code, § 952)—which is the substance of the privilege. (Evid. Code, § 954.)[24] *Second.* In light of Stephens' testimony, the lawyer-client privilege could not be claimed because, by making the telephone call to Pic'l in the presence and hearing of Stephens, Oxenham's communication to Pic'l could not be deemed a confidential communication. To be a confidential communication between client and lawyer, the communication must consist of "information transmitted between a client and his lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation . . . ." (Evid. Code, § 952; *Gonzales* v. *Municipal Court* (1977) 67 Cal.App.3d 111 [136 Cal.Rptr. 475].) *Third.* The prosecution's evidence was sufficient to establish that Oxenham's communications to Pic'l were precluded from coming within the lawyer-client privilege because of an exception to the privilege. Evidence Code section 956 provides that the lawyer-client privilege does not apply "if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." The prosecution's evidence tended to show that Oxenham sought the services of defendant Pic'l, the lawyer, to enable and aid Oxenham to commit the crimes charged against Pic'l in the indictment. (Cf. *Glade* v. *Superior Court* (1978) 76 Cal.App.3d 738 [143 Cal.Rptr. 119].)

F. ▇▇▇ *No Error Was Committed by the Trial Court by Its Failure to Suppress Telephone Records of Yvonne Stephens*

Defendant Pic'l claims that the trial court should have suppressed the telephone records of Yvonne Stephens. We have previously discussed herein under Part D of defendant Pic'l's appeal the claim of Pic'l that the *prosecutor* illegally suppressed the telephone records of Yvonne Stephens. Here, defendant Pic'l makes the additional argument that the

---

[24]Evidence Code section 954 provides, in relevant part, that "the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ."

prosecutor illegally obtained Stephens' telephone records in violation of her constitutional right of privacy and, consequently, that the *trial court* should have suppressed such records and precluded their admissibility into evidence. Defendant relies upon the California vicarious exclusionary rule which gives a party standing to object to the admission into evidence against such party of property illegally seized from another person. (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1]; *People* v. *Underwood* (1964) 61 Cal.2d 113 [37 Cal.Rptr. 313, 389 P.2d 937].)

The illegality asserted by defendant Pic'l is that Yvonne Stephens' constitutional right of privacy in her home telephone records revealing her calls was violated by the prosecution's seizure of those records without first obtaining the judicial sanction of a search warrant. The recognition of a telephone subscriber's reasonable expectation of a right of privacy in telephone records was recognized in *People* v. *Blair* (1979) 25 Cal.3d 640 [159 Cal.Rptr. 818, 602 P.2d 738]. But defendant Pic'l has waived any right to claim error on this appeal since he did not move in the trial court below to suppress these telephone records. (*People* v. *Rogers* (1978) 21 Cal.3d 542 [146 Cal.Rptr. 732, 579 P.2d 1048].) On the contrary, it was defendant Pic'l who introduced Stephens' telephone records into evidence as a defense exhibit. This move was obviously made on the theory that such records in evidence aided Pic'l's defense position in that these records did not show any telephone calls to any area code (714) number and thus constituted substantiating evidence of his claim that Oxenham did not make any calls to him from Yvonne Stephens' home.

G. ▮ *No Error Was Committed by the Trial Court in Compelling Defendant Pic'l as a Witness to Disclose the Name—Gary Oxenham—as the Client Who Made a Telephone Call to Him on August 7, 1978*

Defendant Pic'l testified in his own behalf. While testifying about a telephone call he received from a client with respect to the matter of the return to Kerhulas of the property which had been stolen from him, the trial court required Pic'l to disclose that the client who called him was Oxenham. Pic'l unsuccessfully asserted the lawyer-client privilege in resisting the trial court's ruling requiring him to name Oxenham as the telephone-caller client. The question presented is whether the trial court erred in requiring defendant Pic'l to testify that the name of his client telephone-caller was Gary Oxenham.

We conclude that defendant Pic'l's assertion of the lawyer-client privilege to prevent his disclosure of the name—Gary Oxenham—as Pic'l's client, was not well taken and that the trial court's ruling was correct. We recognize that the *name* of the holder of a confidential communication privilege, such as the *client* in the lawyer-client privilege, and the *patient* in the physician-patient and the psychotherapist-patient privileges, may, under certain circumstances, be considered itself a confidential communication to make the *name* of the client or patient immune from disclosure by virtue of the privilege involved. (See *Marcus* v. *Superior Court* (1971) 18 Cal.App.3d 22 [95 Cal.Rptr. 545, 74 A.L.R.3d 1051] (names and addresses of patients of a physician held to be confidential communications under the circumstances presented and not subject to disclosure).) Under the *Marcus* rationale, we can conclude that the *name* of a client who consults a lawyer about a criminal matter should, normally, be deemed a confidential communication for the purpose of the lawyer-client privilege.

In the case of the lawyer-client privilege, it is the client who is the holder of the privilege (Evid. Code, § 953) and, as such, is entitled to prevent any other person, including the lawyer, from disclosing a confidential communication between him and the lawyer. (Evid. Code, § 954.) Evidence Code section 955 imposes on the lawyer who has received a communication subject to the privilege an obligation to claim the privilege whenever he is in court and a confidential communication is sought to be disclosed. (Evid. Code, § 955.) Of course, the lawyer-client privilege may be waived. But such a waiver takes place only if the *client*, as the holder of the privilege, discloses a significant part of the communication or consents to such disclosure by another. (Evid. Code, § 912, subd. (a).).

In the case at bench, before defendant Pic'l testified as a witness, the testimony of Yvonne Stephens established that Oxenham had disclosed to her a significant portion of Oxenham's communications to Pic'l, the lawyer, to produce a waiver of the lawyer-client privilege between Oxenham and Pic'l and thus foreclose Pic'l from validly asserting the privilege to preclude disclosure of Oxenham's name as the client of Pic'l who made the August 7, 1978, telephone call to Pic'l.

In addition to Oxenham's waiver of the lawyer-client privilege, defendant Pic'l was also foreclosed from validly asserting the lawyer-client privilege by virtue of the *crime* exception to this privilege, created by Evidence Code section 956. As discussed previously, the evidence estab-

lished that Oxenham had sought the services of defendant Pic'l, an attorney, to aid in the criminal plan to have the stolen property of Kerhulas returned to him upon his payment of $2,500 and the execution of a nonprosecution agreement.

### H. ▮ *The Inadmissibility of an Implied Hearsay Statement of Oxenham That He and Defendant Pic'l Were Engaged in a Criminal Conspiracy*

Yvonne Stephens was permitted to testify that in the early morning hours of August 7, 1978, after the arrest of defendant Pic'l, Oxenham came to her house, was in a depressed mood, and made the statement: "Pic'l got busted. Kerhulas screwed us." Defendant Pic'l asserts that the trial court committed error of prejudicial proportions in permitting Stephens to testify to this statement of Oxenham. It is Pic'l's position that this Oxenham statement was inadmissible as hearsay evidence, not coming within any exception to the hearsay rule. The People attempt to justify its admissibility under the admission-of-a-coconspirator exception to the hearsay rule. Defendant Pic'l attacks this theory by arguing that, upon the arrest of defendant Martin on August 3, 1978, and the arrest of defendant Pic'l on August 7, 1978, the conspiracy was at an end and Oxenham's statement—made after the conspiracy had terminated—became inadmissible hearsay.

We analyze first the nature of Oxenham's statement and the purpose for which it was introduced by the prosecution. The *express* words of the statement state two facts: (1) that Pic'l had been arrested; and (2) that Kerhulas (the victim) had fouled up Oxenham's and Pic'l's plans. If offered to prove the truth of these facts asserted by the statement, it was obviously a hearsay statement by declarant Oxenham. (Evid. Code, § 1200, subd. (b).) And if the statement was being offered to prove the truth of the *express* words asserted by the statement, it would also be *irrelevant*. That defendant Pic'l got arrested and Kerhulas fouled up the plans of Oxenham and Pic'l would have no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210) and hence would not satisfy the definition of "relevant evidence" under Evidence Code section 210.

It seems patently clear, however, that the prosecution was offering Oxenham's *express* statement to prove a *relevant, implied* statement that could be reasonably inferred from Oxenham's express words. The express words used by Oxenham were intended to convey to Yvonne

Stephens that he and Pic'l were engaged in a criminal conspiracy plan which had been thwarted by the victim. The first portion of the *implied* statement—that Oxenham and Pic'l had been engaged in a criminal conspiracy plan—was relevant for its truth as it would constitute an admission by Oxenham that he *and Pic'l* were guilty of the offenses charged in the indictment.

A declarant's express words that are offered to prove the *truth* of an *implied* statement to be inferred from such express words constitute a hearsay statement also. Evidence of an express statement that is offered to prove the truth of an *implied* hearsay statement that is implied from the express statement is equally inadmissible hearsay evidence as is evidence of an *express* hearsay statement offered to prove the truth of the facts expressly asserted. (See Jefferson, Cal. Evidence Benchbook (1972) Express Statement Offered for Truth of an Implied Statement, § 1.4, pp. 11-22.)

Can Oxenham's implied hearsay statement that defendant Pic'l was engaged with him in a criminal conspiracy and other crimes satisfy the exception to the hearsay rule for the admission of a coconspirator to make the statement admissible against defendant Pic'l? Admissibility here turns upon the question of whether the conspiracy had terminated when Oxenham, a coconspirator, made his express statement to Stephens which contained an implied statement which implicated Pic'l in criminal activity.

The requirements of the admission-of-a-coconspirator hearsay exception have been discussed previously herein in connection with other hearsay statements made by Oxenham and defendant Martin. The specific requirement at issue here is whether Oxenham's implied hearsay statement—offered against Pic'l as a party defendant—was made "during the time that the party [Pic'l] was participating in that conspiracy." (Evid. Code, § 1223, subd. (b).) If declarant Oxenham's statement was made *after* the conspiracy was terminated, it would then be inadmissible against defendant Pic'l as *not* having been made during the time Pic'l as a party defendant was participating in the conspiracy with the declarant Oxenham.

The theory or rationale for the creation of the admission-of-a-coconspirator exception to the hearsay rule is that, by virtue of the very creation and nature of the conspiracy, each coconspirator authorizes the others to do and say everything that would further the aims of the con-

spiracy. But once some of the coconspirators have been arrested, the conspiracy has come to an end and there is no longer any authorization from the party arrested to any other coconspirator to make statements in furtherance of any conspiracy. (*Callan* v. *Superior Court* (1962) 204 Cal.App.2d 652 [22 Cal.Rptr. 508].)

The principle that once a conspiracy is at an end, a coconspirator's hearsay statement—made after the termination of the conspiracy—is inadmissible against a former fellow coconspirator defendant, applies regardless of the cause of the conspiracy's termination since the authorization to speak on behalf of the conspiracy has been terminated. In *People* v. *Saling* (1972) 7 Cal.3d 844 [103 Cal.Rptr. 698, 500 P.2d 610], and *People* v. *Lawrence* (1972) 25 Cal.App.3d 498 [102 Cal.Rptr. 16], it was made clear that if a conspiracy has been terminated by the commission of the crime that was the objective of the conspiracy, an alleged subsidiary objective to prevent detection and arrest was not an appropriate conspiracy objective to permit admissibility against a defendant of after-the-crime statements of former coconspirators under the admission-of-a-coconspirator exception to the hearsay rule.

In *Saling* and *Lawrence*, the conspiracy was terminated by commission of the crime which was the objective of the conspiracy. In *Callan* and in the case before us, the conspiracy was terminated because of the arrest of one of the principal coconspirators. The result becomes the same. The admissibility of subsequent hearsay statements of a former coconspirator against a defendant cannot be justified by the admission-of-a-coconspirator exception to the hearsay rule. It was error, therefore, for the trial court, in the instant case, to admit Yvonne Stephens' testimony of Oxenham's express statement offered to prove either the truth of the express words or the truth of an *implied* hearsay statement contained within the express words, and made by Oxenham after defendant Pic'l's arrest.

I. █ *No Error Was Committed by the Trial Court in Failing to Give, Sua Sponte, an Instruction of Innocent Intent as a Complete Defense to a Charge of Receiving Stolen Property*

Defendant Pic'l asserts that he presented evidence sufficient to establish that he believed that a valid reward had been offered by Kerhulas to Pic'l's client, Oxenham, for the return of Kerhulas' stolen property; that Pic'l was acting as a good-faith agent in taking possession of the

stolen property in order to return it to Kerhulas and collect some $2,500 in reward money to be conveyed to his client, Oxenham, whom he believed had not participated in the theft of the property; that Pic'l's sole intent in taking possession of the stolen property was to immediately cause its return to its rightful owner and collect the reward money for his client.

Pic'l contends that it was error for the trial judge not to give, *sua sponte*, an instruction that such an innocent intent constituted a complete defense to the charge of violating Penal Code section 496—receiving stolen property. Pic'l contends that the instruction which the trial court was required to give, *sua sponte*, was one to be patterned after the reasoning in *People* v. *Osborne* (1978) 77 Cal. App.3d 472 [143 Cal.Rptr. 582]. *Osborne* held that a person who knowingly received stolen property, but whose intent in doing so was not to deprive the true owner of the property but to take possession only for the time required to return it to the owner, was not guilty of the crime of violating Penal Code section 496, and that a defendant who presented evidence of such a defense was entitled to an instruction on such a defense. Defendant also asserts that the failure of his trial counsel to request an *Osborne*-type instruction constituted constitutionally ineffective assistance of trial counsel.

Defendant Pic'l's contention regarding the failure of the trial court to give an *Osborne*-type instruction is untenable. The trial court gave an instruction which covered substantially and adequately the *Osborne*-type defense. Thus, the trial court instructed the jury that an offer of a reward is a legally permissible method for an owner to attempt to induce the return of property and that an offer of a reward will result in a contractual status if the terms and conditions of the offer are in good faith fulfilled. This instruction adequately told the jury that it was legal for defendant Pic'l to receive Kerhulas' stolen property and that no crime was committed if Pic'l did so for the purpose of returning it to Kerhulas in exchange for an offer of reward made by Kerhulas. No additional instruction regarding the *Osborne*-type defense was required, whether requested by defense counsel or not.

J. ▮▮▮ *The Defense of Entrapment Was Not Established by the Evidence as a Matter of Law*

Defendant Pic'l claims that the evidence establishes as a matter of law the defense of entrapment within the meaning of *People* v. *Barraza*

(1979) 23 Cal.3d 675 [153 Cal.Rptr. 459, 591 P.2d 947]. Defendant advances this claim on the basis of his testimony that he did not know of any "reward money" until after he had made telephone contact with Kerhulas, the victim, who was then acting as an agent of law enforcement in an effort to "bug" and record telephone calls that were expected to come from defendant Pic'l, an attorney, because Oxenham, Pic'l's client, had told Kerhulas he would have an attorney telephone him to arrange for the return of the stolen property. It is Pic'l's argument that, at the suggestion of the police, Kerhulas informed Pic'l about the $3,000 offered as a reward and induced Pic'l to "negotiate" the $3,000 amount down to $2,500 and thus make Pic'l's honest motive appear to have a sinister and criminal intent.

The *Barraza* case, relied upon by defendant Pic'l, is considered as having established a new test for the defense of entrapment. Prior to *Barraza*, the focus of the inquiry with respect to the defense of entrapment was upon the predisposition of the defendant to commit the crime in question. If the criminal intent originated with the defendant, he was denied the defense of entrapment irrespective of the conduct of law enforcement officials. This approach was a *subjective* approach. The *Barraza* case adopted an *objective* approach where the focus of the inquiry is upon the conduct of the law-enforcement officials rather than on whether the defendant was "predisposed" to commit the offense or was "otherwise innocent."

Thus, *Barraza* set forth the test for entrapment by observing: "[W]as the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense? For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime." (*Barraza, supra*, 23 Cal.3d 675, 689-690.)

In the *Barraza* case itself, the court held that the trial court erred in failing to instruct the jury, *sua sponte*, on the defense of entrapment. There the error was deemed prejudicial since the issue of entrapment was not submitted to the jury under any entrapment instructions whatever. The new concept of the defense of entrapment set forth in *Barraza*

is not applicable to the case before us since *Barraza* was made applicable only to trials that started after the decision became final. (*Id.* at p. 691, fn. 5.)[25]

But even if the *Barraza* entrapment test was applicable to the instant case, it could be of no assistance to defendant Pic'l. The prosecution's evidence was contrary to that presented by defendant Pic'l. The jury was not required to accept Pic'l's testimony with respect to the content of his conversations with Kerhulas. By believing the prosecution's evidence, the jury obviously concluded that the first contact between Kerhulas and Pic'l was initiated by Pic'l wherein Pic'l telephoned Kerhulas and set forth the arrangements for the return to Kerhulas of the latter's stolen property. In that telephone call and in subsequent telephone calls, Pic'l dictated to Kerhulas the terms for return of the property, and Kerhulas offered no inducement to Pic'l. The tape recordings of their conversations which the jury heard do not include the word, "reward." Instead, the recordings show that Kerhulas on several occasions almost terminated negotiations with Pic'l because Kerhulas feared that his property would not be returned to him. In view of the conflict in the evidence, defendant Pic'l's argument that his defense of entrapment was established as a matter of law must be described as simply incredible.

K. ■ *Did the Trial Court Commit Error in Permitting the Prosecutor to Cross-examine Defendant Pic'l's Good-character Witnesses as to Whether They Had Heard Reports About Specific Acts of Conduct on Defendant Pic'l's Part?*

Defendant Pic'l called several defense character witnesses. On direct examination they were asked to give their *personal* opinions and their knowledge of Pic'l's *reputation* for truth, honesty and veracity. Their answers were all favorable. Over defense objection, the trial court permitted the prosecutor to ask these good-character witnesses whether they had heard reports of the following about defendant Pic'l: (1) that he had once filed a petition for bankruptcy; (2) that he had been sued for nonpayment of rent; (3) that he had issued a check without sufficient funds; and (4) that an answering service had cancelled his

---

[25]The decision in *Barraza* was filed on March 15, 1979, and became final 30 days thereafter. (Cal. Rules of Court, rule 24(a).) Trial of the case before us began on April 12, 1979, a few days before the *Barraza* decision became final.

subscription for nonpayment of the charges for services. The defense objection to the cross-examination was that the specific conduct items inquired about were not relevant to the character traits in issue—honesty, truth and veracity.

Most of these witnesses testified that they had not heard of such reports and that even if they had, it would not change their opinion as to Pic'l's good character for honesty, truth and veracity.

Defendant Pic'l asserts that it was error for the trial court to have permitted such cross-examination, and that the error was prejudicial because credibility of defendant Pic'l was a critical issue in his trial.

Defendant Pic'l also claims that the trial court's ruling was error because he had made a demand upon the prosecutor for discovery of any evidence in his possession which he believed was adverse to defendant Pic'l with respect to the character traits of honesty, truth and veracity. Had the prosecutor complied with this request, defendant Pic'l asserts he would then have been in a position to make the tactical decision of whether to use good-character witnesses in his defense.

It is now well established law that a defendant may produce in his defense character witnesses who may testify to their *personal opinions* or to a defendant's *reputation* with respect to defendant's character traits that are pertinent to the elements of the particular crime charged against the defendant. Evidence of a defendant's pertinent character trait is relevant on the issue of guilt or innocence as it is some proof that defendant acted in conformity with such pertinent character trait and did *not* commit the crime charged. (Evid. Code, § 1102, subd. (a); *People* v. *Aguilar* (1973) 32 Cal.App.3d 478 [108 Cal.Rptr. 179].)

In the case at bench, defendant Pic'l was convicted of the crimes of (1) conspiracy to commit several different offenses; (2) extortion; and (3) receiving stolen property. The character traits of honesty, integrity and truthfulness were the character traits to which the testimony of the character witnesses was directed, and are pertinent and relevant to the elements of the crimes charged and of which defendant Pic'l was convicted. The testimony of the character witnesses was thus relevant evidence tending to establish that defendant Pic'l did not commit these offenses on the circumstantial-evidence-reasoning process that a person tends to conduct himself *on a specific occasion* in conformity with his

particular character trait—a propensity or disposition to act in a certain way.

The credibility of a good-character witness is subject to attack just as is the credibility of any other witness. The usual attack upon a character-witness' credibility is to seek to establish that the witness' opinion or knowledge of defendant's reputation of pertinent character traits is not well founded. The permissible rule of evidence is to allow the cross-examiner to inquire whether the character witness has *heard*—rather than *knows*—that defendant has committed specific acts that are inconsistent with the character trait to which the witness has testified. (*Aguilar, supra,* 32 Cal.App.3d 478; *People* v. *Qui Mei Lee* (1975) 48 Cal.App.3d 516 [122 Cal.Rptr. 43].)

In addition to the requirement that the cross-examination be limited to inquiries about reports of defendant's acts that are inconsistent with pertinent character traits, the cross-examiner must act in good faith in making his cross-examination inquiries. The good-faith limitation requires that the cross-examiner have in his possession information that reasonably leads him to believe that the acts of conduct by defendant have in fact been committed or the reports of their commission have been generally circulated. (See Jefferson, Cal. Evidence Benchbook (1972) Limitations on Attacking Credibility of a Good-Character Witness, § 28.13, pp. 484-488.)

In the case at bench, the principal issue is whether the acts of conduct by defendant Pic'l, reports of which were inquired about on the cross-examination of his good-character witnesses, were pertinent or relevant to *dispute* or *belie* the character traits of honesty, integrity or truthfulness.

First, we consider the act of filing for bankruptcy a permissible procedure authorized by federal law for beleaguered debtors. This act would have no reasonable tendency to establish that a person filing for bankruptcy was dishonest, lacked integrity or was untruthful. It was thus error for the trial court to permit cross-examination of the good character witnesses about Pic'l filing for bankruptcy.

Second, we consider the acts of failure to pay rent or other obligations, with the consequence that lawsuits were filed by creditors to collect. Again, acts of failure to pay obligations with resultant lawsuits as a consequence without a knowledge of surrounding circumstances, do

not reasonably lead to an inference of the debtor being dishonest, untruthful or lacking in integrity. Any such inference would be highly speculative and conjectural and thus irrelevant. It was thus error for the trial court to permit Pic'l's character witness to be cross-examined about hearsay reports of such acts.

Next, we consider the act of issuing a check without sufficient funds. Here the prosecutor indicated to the trial judge that he was in error regarding his information on this matter and the jury was admonished accordingly to disregard the question.

Did the trial court commit error by permitting the cross-examination of Pic'l's character witnesses in view of the fact that the prosecutor had not responded to defense counsel's informal request for discovery of any impeaching character-trait evidence? *No.* The defendant Pic'l made no effort to obtain a court order for discovery. Furthermore, this information was not the kind that the prosecutor had better access to than the defendant. Defendant Pic'l had full knowledge about these acts. His informal request for discovery was simply a fishing expedition seeking to learn whether the prosecutor was aware of these facts.

We conclude that although the trial court erred in permitting the cross-examination of defendant Pic'l's character witnesses on *reports* of matters that were irrelevant to dispute the relevant character traits in issue, the error was harmless. The probative value of personal opinion or reputation evidence of a defendant's good character traits to prove that he did *not* commit a charged crime or to support his credibility as a witness is slight at best. There was thus little danger that the jury would fail to follow the trial court's instructions regarding the use of such evidence, and consider that the acts had taken place in spite of the court's instructions. We hold that the danger that the jury would have believed that these acts of a financial nature took place and that they indicated defendant Pic'l to be a man of bad character to constitute evidence of his guilt of the crimes charged was so utterly minimal that it can best be described as inconsequential.

L. ▇ *The Trial Court's Ruling Denying Defendant Pic'l's Motion for a New Trial Is Not Subject to Attack on the Ground That the Court Used an Improper Standard in Making Its Ruling*

We have previously discussed the issue of the validity of the trial court's ruling with respect to the defendant Pic'l's motion for a new tri-

al based on newly discovered evidence. We now consider defendant Pic'l's contention that the trial court used an improper standard in considering his motion for a new trial in general. Defendant in effect charages the trial judge with abdicating all responsibility and taking the view that since defendant desired a jury trial, he should be satisfied with whatever verdict the jury renders. Defendant Pic'l draws this conclusion from picking out certain comments the trial judge made in rendering his ruling on the motion for a new trial.

We disagree with defendant Pic'l's conclusion that the trial court refused to consider and weigh the points made by him in urging the granting of a new trial. We consider that the trial court properly applied the rule of law that the granting or denying of a party's motion for a new trial is a matter within the sound discretion of the trial court. (*People* v. *McDaniel* (1976) 16 Cal.3d 156 [127 Cal.Rptr. 467, 545 P.2d 843].) It is also a principle of appellate review that, absent a showing of a manifest abuse of discretion, the trial court's ruling is not to be disturbed on appeal. We find no abuse of discretion in the instant case.

M. ▮ *Defendant Pic'l Was Not Denied His Constitutional Right to the Effective Assistance of Trial Counsel*

Defendant Pic'l claims that he was denied his constitutional right to the effective assistance of trial counsel by reason of his trial counsel's failure to do the following: to move to suppress the telephone records of Yvonne Stephens; to request the *Osborne*-type instruction on innocent intent; to request a court order for the production of the prosecution's evidence of impeaching character-trait evidence which was used in the cross-examination of the good-character witnesses; to obtain a court order requiring the prosecution to call Oxenham, the unindicted accomplice, as a witness; to seek an evidentiary hearing during the hearing on the motion for a new trial regarding the newly discovered evidence from Oxenham; to raise the constitutional right-of-witness confrontation to preclude Stephens' testimony of Oxenham's hearsay statements and Kerhulas' testimony of Oxenham's hearsay statements that were offered in evidence under the admission-of-a-coconspirator hearsay exception; and to object to Stephens' testimony relating a hearsay statement of Oxenham made after defendant Pic'l's arrest that implicated defendant Pic'l.

All of these matters raised by defendant Pic'l we have previously discussed herein in parts A through L under the heading "Defendant Pic'l's

Appeal." As our previous discussion of these points indicates, defendant Pic'l's claim that he was denied the effective assistance of trial counsel guaranteed to him by the federal Constitution must be rejected as completely lacking in substance.

■■■ The burden of establishing the constitutional defect of ineffective assistance of counsel is upon a defendant. (*People* v. *Camden* (1976) 16 Cal.3d 808, 816 [129 Cal.Rptr. 438, 548 P.2d 1110].) This burden can only be satisfied by defendant making a showing that his defense trial counsel failed to perform in a manner to be expected of reasonably competent attorneys acting as diligent advocates—with the consequence that counsel's acts or omissions resulted in the withdrawal of a crucial or potentially meritorious defense. (*People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) This burden to prove ineffective assistance of counsel must amount to "a demonstrable reality and not a speculative matter." (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].)

■■■ Our review of the record in this case satisfies us that defendant Pic'l has not met his burden of proof to establish the issue of ineffective assistance of trial counsel. On the contrary, the record reveals that defendant Pic'l's trial counsel acted diligently and competently throughout the trial, including thorough cross-examination of prosecution witnesses in view of possible defenses; that he raised pertinent objections, presented a strong defense and advanced competent argument to the bench and to the jury. Defendant Pic'l's appellate counsel is simply reaching at straws in asserting an inadequacy on the part of trial counsel for defendant Pic'l.

N. ■■■ *There Is No Insufficiency of the Evidence to Support Defendant Pic'l's Conviction*

Without specifying any particular deficiencies in the evidence, defendant Pic'l simply asserts that, under the standard set forth in *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781], the evidence was not such that a jury could find him guilty beyond a reasonable doubt. Defendant Pic'l does suggest, however, that we should look—not only at the evidence introduced at his trial—but at the newly discovered evidence presented on his motion for a new trial and in his petition for a writ of habeas corpus. We have previously discussed under part C of "Defendant Pic'l's Appeal" the alleged newly discovered

evidence in considering this defendant's contention that the trial court erred in not holding an evidentiary hearing on his motion for a new trial. We mention in passing that settled law requires us to decline defendant Pic'l's invitation that we consider on this appeal matters which are not part of the record on appeal. (*Snider* v. *Basinger* (1976) 61 Cal.App.3d 819, 823 [132 Cal.Rptr. 637].)

It would also appear that defendant Pic'l's claim of an insufficiency of the evidence is at best no more than an impermissible suggestion that, as a reviewing court, we should reweigh the evidence already considered by the jury in reaching its finding of guilt.

Applying the principles set forth in *Jackson* v. *Virginia, supra,* 443 U.S. 307, we have no hesitancy in holding that a consideration of all the evidence presented in the case at bench—both prosecution and defense evidence—leads unequivocally to the conclusion that a rational trier of fact could have found that defendant Pic'l was guilty beyond a reasonable doubt by virtue of the essential elements of the crimes of which such defendant was found convicted being established beyond a reasonable doubt.

### O. *The Error in Defendant Pic'l's Sentence*

Defendant Pic'l contends that his sentence on count I (conspiracy) to state prison for the "midterm of six years" exceeds the maximum sentence permitted by law. The People concede that this contention of defendant Pic'l is valid.

Penal Code section 182, dealing with the offense of conspiracy, provides that where there is a conspiracy to commit two or more felonies which have different punishments, the penalty for conspiracy shall be that prescribed for the felony which carries the greater term. Thus, the maximum sentence which could lawfully be imposed on defendant Pic'l for his conviction of conspiracy under count I of the indictment would be the highest prison term prescribed as punishment for any of the felonies which he conspired to commit. The highest penalty prescribed for any of the felonies which defendant Pic'l conspired to commit was the penalty for extortion (Pen. Code, § 520), which carries a midterm of three years. Hence, the judgment against defendant Pic'l must be modified as to the sentence on count I to reflect a midterm of *three* years rather than a midterm of *six* years.

## V

*The Question of Whether the Errors Below Were Prejudicial*

Of the numerous contentions of errors urged by defendants Pic'l and Martin, we have found only a few that were meritorious. Most of the contentions of error were lacking in merit. Are the errors that have been discussed herein of such a nature as to require a reversal of the convictions of either defendant or of both? *No!* Our examination of the entire record convinces us that it is not reasonably probable that a result more favorable to either defendant would have been reached in the absence of the errors discussed herein. (See *People v. Duran* (1976) 16 Cal.3d 282, 296 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendants have urged upon use the applicaton of the rule of reversal set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The *Chapman* rule provides that if error has resulted in deprivation of a defendant's *constitutional* right of sufficient stature, a reversal is required unless it is established that the error was nonprejudicial beyond a reasonable doubt. The errors we have found in the record fall under the *Watson* and *Duran* standard and not under the *Chapman* standard. But even if the *Chapman* standard was the applicable standard, our result would be the same. The errors are such that they were nonprejudicial beyond a reasonable doubt.

The judgement against defendant Randall James Martin is affirmed. The judgment against defendant Dean Richard Pic'l is modified by reducing the sentence on count I from six years to three years. As so modified, the judgment against defendant Dean Richard Pic'l is affirmed.

Hanson (Thaxton), Acting P. J., and Title, J.,* concurred.

A petition for a rehearing was denied February 18, 1981, and the petition of appellant Pic'l for a hearing by the Supreme Court was denied April 1, 1981.

---

*Assigned by the Chairperson of the Judicial Council.